[L.A. No. 29811. In Bank. May 27, 1971.]

SAIL'ER INN, INC., et al., Petitioners, v.
EDWARD J. KIRBY, as Director, etc., et al., Respondents.

## Counsel

Manuel H. Miller and Julius A. Dix for Petitioners.

Richard Gladstein, Gladstein, Leonard, Patsey & Andersen, and Herma Hill Kay as Amici Curiae on behalf of Petitioners.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, and Henry G. Ullerich, Deputy Attorney General, for Respondents.

## OPINION

**PETERS, J.**—Petitioners, holders of on-sale liquor licenses, seek a writ of mandate to prevent the Department of Alcoholic Beverage Control from revoking their licenses because they hired women bartenders, contrary to the prohibition contained in section 25656 of the Business and Professions Code.[1] Section 25656 prohibits women from tending bar except when they are licensees, wives of licensees or are, singly or with their husbands, the sole shareholders of a corporation holding the license.[2] Petitioners and amicus curiae contend that the code section violates article XX, section 18 of the California Constitution, the 1964 Federal Civil Rights Act (42 U.S.C.A. § 2000e-2), and the equal protection clauses of the United States and California Constitutions.[3]

Petitioners challenge the constitutionality of the statute on its face; no material facts are disputed.[4] They raise important legal issues of state-

---

[1]Petitioners have standing to raise the constitutional rights of those women excluded from bartending because they are also criminally liable under that statute for hiring women bartenders, and face possible license revocation as well. (See *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 481 [14 L.Ed.2d 510, 512-513, 85 S.Ct. 1678].)

[2]Section 25656 of the Business and Professions Code provides: "Every person who uses the services of a female in dispensing wine or distilled spirits from behind any permanently affixed fixture which is used for the preparation or concoction of alcoholic beverages, or in mixing alcoholic beverages containing distilled spirits, on any premises used for the sale of alcoholic beverages for consumption on the premises, or any female who renders such services on such premises, is guilty of a misdemeanor, and upon conviction is punishable by a fine of not more than one hundred dollars ($100) or by imprisonment in the county jail for not more than three months, or by both such fine and imprisonment.

"The provisions of this section do not apply to the dispensing of wine or distilled spirits or to the mixing of alcoholic beverages containing distilled spirits by any on-sale licensee, or to the dispensing of wine or distilled spirits or to the mixing of such beverages by the wife of any licensee on the premises for which her husband holds an on-sale license, or to the dispensing of wine or distilled spirits or to the mixing of such spirits by a female, when she is the sole shareholder or when she and her husband are the sole shareholders of the corporation which holds the on-sale license for the premises."

[3]After the petition was filed in this case, the Fair Employment Practices Act (Lab. Code, § 1410 et seq.) barring discrimination in employment, was amended to include discrimination on the basis of sex. (Stats. 1970, ch. 1508, p. 40.) The Fair Employment Practices Act makes it an unlawful employment practice to discriminate on the basis of sex except where such discrimination is based on a bona fide occupational qualification, as does the 1964 Federal Civil Rights Act (42 U.S.C.A. § 2000e-2, see section II, *infra*). Because we find section 25656 invalid on other grounds, we need not reach the question whether the amendment impliedly repeals section 25656.

[4]The Attorney General concedes that petitioners Sail'er Inn, Inc. and Walter Robson each have 25 employees, thereby bringing them under the 1964 Civil Rights Act. Petitioners Angelo E. Gianone and Josephine Van Epps apparently do not have the requisite 25 employees nor does it appear that the Alcoholic Beverage Control Department has begun or threatened proceedings against them for violation of section 25656.

wide significance. ■ Two of them are placed in the untenable situation of having to choose whether to obey possibly conflicting federal and state laws and face a penalty under the one they choose to disobey. In light of these extraordinary circumstances, it would be improper to require them to exhaust their administrative remedies.

■ ■ Mandamus, like certiorari, is an appropriate writ for the review of the exercise of quasi-judicial power by constitutionally authorized statewide agencies such as the Department of Alcoholic Beverage Control (Cal. Const., art. XX, § 22; *People* v. *County of Tulare*, 45 Cal.2d 317, 319 [289 P.2d 11]; *Boren* v. *State Personnel Board*, 37 Cal.2d 634, 637 [234 P.2d 981]; see also Kleps, *Certiorarified Mandamus Reviewed: The Courts and California Administrative Decisions—1949-1959*, 12 Stan.L.Rev. 554, 555, 563, fn. 35.) ■ While ordinarily mandamus will issue only after final order or decision of the administrative agency, a limited number of exceptions to the exhaustion doctrine have long been recognized in this state. (See, e.g., *County of Alpine* v. *County of Tuolumne* (1958) 49 Cal.2d 787 [322 P.2d 449]; *United States* v. *Superior Court* (1941) 19 Cal.2d 189 [120 P.2d 26]; *Diaz* v. *Quitoriano*, 268 Cal. App.2d 807, 812 [74 Cal.Rptr. 358].)

The writ of mandate "may be issued by any court . . . to any inferior tribunal, corporation, board, or person . . . to compel the admission of a party to the use and enjoyment of a *right* or office to which he is entitled, and from which he is unlawfully precluded by such inferior tribunal, corporation, board or person." (Italics added.) (Code Civ. Proc., § 1085.) In a number of cases, mandamus has been held to issue to prohibit official conduct where prohibition would not lie because the threatened official act was not judicial but ministerial in nature. (*Miller* v. *Greiner*, 60 Cal.2d 827, 830 [36 Cal.Rptr. 737, 389 P.2d 129]; *Perry* v. *Jordan*, 34 Cal.2d 87 [207 P.2d 47]; *Evans* v. *Superior Court*, 20 Cal.2d 186 [124 P.2d 820]; see 3 Witkin, Cal. Procedure (1954) § 77, pp. 2575-2577.)

■ Accordingly, although the remedy of certiorari might be appropriate as to the petitioners who have been charged with violations of section 25656, mandate is also appropriate, and mandate is an appropriate remedy for those petitioners not yet charged but who wish to employ female bartenders and fear enforcement of the section by defendant.

■ By issuing the alternative writ, we have determined that the legal remedy is inadequate, and the exercise of our jurisdiction in this case is proper. (*San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 945 [92 Cal.Rptr. 309, 479 P.2d 669]; *Westbrook* v. *Mihaly*

(1970) 2 Cal.3d 765, 773 [87 Cal.Rptr. 839, 471 P.2d 487]; *Hagan* v. *Superior Court* (1960) 53 Cal.2d 498 [2 Cal.Rptr. 288, 348 P.2d 896].)

## I. Section 18 of Article XX of the State Constitution

Article XX, section 18 of the California Constitution provides that "[a] person may not be disqualified because of sex, from entering or pursuing a lawful business, vocation, or profession."[5]

■ In explicit and unqualified language, this section makes it clear that sex alone may not be used to bar a person from a vocation, profession or business. (See, e.g., *Carter* v. *City of Los Angeles* (1948) 31 Cal.2d 341, 346 [188 P.2d 465]; *Matter of Maguire* (1881) 57 Cal. 604.) Provisions of the Constitution are "mandatory and prohibitory, unless by express words they are declared to be otherwise." (Cal. Const., art I, § 22.) ■ Section 18 constitutes a restraint upon the law-making power of the state, and legislative enactments contrary to its provisions are void.

Well before the turn of the century this court enunciated the meaning and effect to be given this section of the Constitution in a case quite similar to the instant one. *Matter of Maguire, supra,* 57 Cal. 604, held that a San Francisco ordinance which prohibited women from waiting on customers between 6 p.m. and 6 a.m. in a place where liquor was sold conflicted with section 18.

Justice Thornton, expressing the opinion of three of the four justices in the majority, said: "As we understand the section, it does establish, as the permanent and settled rule and policy of this State, that *there shall be no legislation either directly or indirectly incapacitating or disabling a woman from entering on or pursuing any business, vocation, or profession* permitted by law to be entered on and pursued by those sometimes designated as the stronger sex. . . . [T]here are no exceptions in this section, and neither we nor any other power in the State have the right or authority to insert any, whether on the ground of immorality or any other ground. All these are considerations of policy, the determination of which belonged to the convention framing and the people adopting the Constitution; and their final and conclusive judgment has been expressed and entered in the clear and unmistakable language of the Constitution itself, . . ." (Italics added.) (*Matter of Maguire, supra,* 57 Cal. at p. 608.)[6]

---

[5]Section 18 was amended slightly by general election of November 3, 1970. Prior to that, the section read as follows: "No person shall, on account of sex, be disqualified from entering upon or pursuing any lawful business, vocation, or profession."

[6]The fourth member of the majority, in his concurring opinion, took the position that, while sentimentality or prejudice cannot be grounds for prohibiting women from

As *Maguire* made clear, section 18 does not admit of exceptions based on popular notions of what is a proper, fitting or moral occupation for persons of either sex. Although an inability to perform the tasks required by a particular occupation, sex-linked or not, may be a justification for discrimination against job applicants, under section 18, mere prejudice, however ancient, common or socially acceptable, is not.

If section 18 is to be endowed with any force and meaning it must invalidate section 25656. It is clear that bartending is a lawful vocation, that women are as capable of mixing drinks as men, and that section 25656 nonetheless disqualifies the vast majority of women from entering the bartending occupation.

The Attorney General makes two arguments based on the notion that women are incapable of tending bar. First, he suggests that the Legislature may have concluded that a male bartender or owner must be present in a liquor establishment to preserve order and protect patrons, a function which he contends a woman could not perform. This argument ignores modern day reality. Today most bars, unlike the saloons of the Old West, are relatively quiet, orderly and respectable places patronized by both men and women. Even if they were not, many bars employ bouncers whose sole job is to keep order in the establishment. Furthermore, the experience in the states which permit women to tend bar indicates that the dire moral and social problems predicted by the Attorney General do not arise. (See, e.g., *Paterson Tavern & G. O. A.* v. *Borough of Hawthorne* (1970) 57 N.J. 180, 186 [270 A.2d 628, 631]; *Anderson* v. *City of St. Paul* (1948) 226 Minn. 186, 209 [32 N.W.2d 538, 550-551] (dissenting opinion by Loring, C.J.).)

Second, the Attorney General argues that the statute was designed to protect women since fewer women can be injured by inebriated customers if they are not permitted to work behind a bar. It is difficult to believe that women working behind the bar would be more subject to such dangers than the cocktail waitresses who are now permitted to work among the customers.

But even if we assume that bartending is more dangerous than waiting on tables, there is no evidence that women bartenders are more likely than male bartenders to suffer injury at the hands of customers. The desire to protect women from the general hazards inherent in many occupations cannot be a valid ground for excluding them from those occupations under

entering or pursuing a particular business or profession, the Legislature may require that the sexes pursue their chosen occupation separately where the "*conjoint*" pursuit" of that occupation leads to indecency and immorality.

section 18. Women must be permitted to take their chances along with men when they are otherwise qualified and capable of meeting the requirements of their employment. (See Kanowitz, Women and The Law (1969) pp. 33-34.) We can no more justify denial of the means of earning a livelihood on such a basis than we could deny all women drivers' licenses to protect them from the risk of injury by drunk drivers. Such tender and chivalrous concern for the well-being of the female half of the adult population cannot be translated into legal restrictions on employment opportunities for women.

 A third contention raised by the Attorney General is that section 25656 was intended to prevent improprieties and immoral acts. Section 18 in no way prevents the Legislature from dealing effectively with the evils and dangers inherent in selling and serving alcoholic beverages; it merely precludes resort to legislation against women rather than against the particular evil sought to be curbed.[7]

We reiterate what Justice Thornton said so long ago in *Maguire* in response to the contention that permitting women to serve drinks leads to immorality: "[T]he law-making power of the State is ample to make laws affecting both sexes alike, and not inhibited by the Constitution, which will accomplish the object so much desired—to prevent practices hurtful to public morality. The Constitution was not framed with a disregard of the important considerations urged upon us in this regard. It merely directs that a law which is framed to accomplish this object by affecting or operating upon lawful callings, shall affect both sexes alike." (*Matter of Maguire, supra,* 57 Cal. at p. 609.)

 Section 25656 is repugnant to article XX, section 18, of the California Constitution and is therefore void.

## II. The 1964 Civil Rights Act

Petitioners urge that section 25656 conflicts with the nondiscriminatory hiring provision contained in title VII of the federal Civil Rights Act of 1964 (42 U.S.C.A. § 2000e-2(a)). A state law, however clearly within a state's acknowledged power, which interferes with or is contrary to federal law is void under the supremacy clause of the United States Constitution (U.S. Const., art. VI, cl. 2; *Free* v. *Bland* (1962) 369 U.S.

---

[7]We overrule *Ex parte Hayes* (1893) 98 Cal. 555 [33 P. 337], which took the patently untenable position that article XX, section 18, does not limit the power of the state to regulate the manner in which retail liquor businesses are conducted. Article XX, section 22, which provides for alcoholic beverage control, states that constitutional provisions inconsistent with section 22 are repealed. Section 18 is in no way inconsistent with section 22.

663, 666 [8 L.Ed.2d 180, 183, 82 S.Ct. 1089]; *Gibbons* v. *Ogden* (1824) 22 U.S. (9 Wheat.) 1, 11 [6 L.Ed. 23, 25]; *Richards* v. *Griffith Rubber Mills* (D.Ore. 1969) 300 F.Supp. 338, 340; *Rosenfeld* v. *Southern Pacific Company* (C.D.Cal. 1968) 293 F.Supp. 1219, 1224).

The Attorney General urges, however, that the federal Civil Rights Act does not apply because section 2 of the Twenty-first Amendment to the United States Constitution precludes federal interference with state regulation of alcoholic beverages. Section 2 provides that "[t]he *transportation or importation into any State,* Territory, or possession of the United States for delivery or use therein of intoxicating liquors, *in violation of the laws thereof,* is hereby prohibited." (Italics added.) The Attorney General contends that this amendment "cedes vast plenary powers" to the states to regulate alcoholic beverages "unfettered" by the commerce clause. Since the 1964 Civil Rights Act was passed pursuant to Congress' commerce clause power, it is contended that a state's power to regulate liquor is also unfettered by the 1964 Civil Rights Act.

This argument must fail. The Twenty-first Amendment clearly was not intended to work such a wholesale "repeal" of the commerce clause in the area of alcoholic beverage control. When national prohibition was terminated by section 1 of the Twenty-first Amendment, section 2 was added as a "saving clause" to protect the laws of states which chose to retain prohibition against a possible conflict with the commerce clause. (See *United States* v. *Colorado Wholesale W. & Liq. Deal. Ass'n.* (D.Colo. 1942) 47 F.Supp. 160, 162, revd. 144 F.2d 824, revd. 324 U.S. 293 [89 L.Ed. 951, 65 S.Ct. 661]; *Joseph Triner Corporation* v. *Arundel* (D.Minn. 1935) 11 F.Supp. 145, 146-147.) The language of the amendment clearly reflects the purpose, since it prohibits the importation or transporting of liquor only into states where such importation will be in violation of the laws thereof.

Section 2 represents the incorporation of a somewhat narrowed version of the Webb-Kenyon Act (37 Stats. 699, 27 U.S.C.A. § 122 (1913)) into the Constitution. (*Washington Brewers Institute* v. *United States* (9th Cir. 1943) 137 F.2d 964, 967, cert. den. 320 U.S. 776 [88 L.Ed. 465, 64 S.Ct. 89]; Note, *The Twenty-First Amendment Versus the Interstate Commerce Clause* (1946) 55 Yale L.J. 815, 816-818.) The Webb-Kenyon Act was passed in 1913 under the title "[a]n Act divesting intoxicating liquors of their interstate character in certain cases." Its purpose was to "'prevent the immunity characteristic of interstate commerce from being used to permit the receipt of liquor through such commerce in States contrary to their laws, and thus in effect afford a means by subterfuge and indirection to set such laws at naught.'" (*Seaboard Air Line Ry.*

v. *North Carolina* (1917) 245 U.S. 298, 303 [62 L.Ed. 299, 303, 38 S.Ct. 96].)

Although some early cases painted state powers under section 2 of the Twenty-first Amendment with a broad brush, later decisions have taken a position more in keeping with the original intent of the amendment. (See, e.g., *Seagram & Sons* v. *Hostetter* (1966) 384 U.S. 35, 42 [16 L.Ed.2d 336, 342, 86 S.Ct. 1254]; *Hostetter* v. *Idlewild Liquor Corp.* (1964) 377 U.S. 324 [12 L.Ed.2d 350, 84 S.Ct. 1293].). In *Hostetter* v. *Idlewild Liquor Corp., supra,* the Supreme Court restated the effect of the Twenty-first Amendment: " 'Since the Twenty-first Amendment . . . the right of a state to prohibit or regulate the *importation* of intoxicating liquor is not limited by the commerce clause.' " (Italics added.) (*Id.,* at p. 330 [12 L.Ed.2d at p. 355].) The court rejected the argument that the Twenty-first Amendment gave the states plenary power over alcoholic beverages: "To draw a conclusion . . . that the Twenty-first Amendment has somehow operated to 'repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned would . . . be an absurd over-simplification. If the Commerce Clause had been *pro tanto* 'repealed,' then Congress would be left with no regulatory power over interstate or foreign commerce in intoxicating liquor. Such a conclusion would be patently bizarre and is demonstrably incorrect." (*Id.,* at pp. 331-332 [12 L.Ed.2d at p. 356].)

The court then went on to declare that "[b]oth the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case." (*Id.,* at p. 332 [12 L.Ed.2d at p. 356].)[8]

 Thus it is apparent that the Twenty-first Amendment not only does not reach all alcoholic beverage cases which would otherwise fall within Congress' commerce clause powers, but even in those situations covered by the express language of the amendment, some balancing and accommodation must take place.

Section 25656 is not even tangentially related to "transportation or importation" of liquor into California, and therefore does not fall within the literal language of the Twenty-first Amendment. The statute merely

[8]See Note, *The Supreme Court, 1963 Term: State Taxation and Regulation* (1964) 78 Harv.L.Rev. 143, 237, 240, which concludes that the recognition of an accommodation between the Twenty-first Amendment and the commerce clause "casts doubt on cases holding that the amendment frees the states completely from commerce clause limitations."

regulates employment at the retail level, and has nothing to do with the flow of alcoholic beverages into the state.

But even if the amendment were broadly construed to cover all state laws regulating the liquor business, the interests and issues at stake in employment discrimination cases present no conflict with the intent and purposes of the Twenty-first Amendment. ▆▆▆ Title VII of the Civil Rights Act was passed to prevent the impact of racial and sexual discrimination in employment on interstate commerce. It was not enacted to regulate the flow of alcohol as a commodity in interstate commerce. Since the aim of the Civil Rights Act is so wholly different from that of the Twenty-first Amendment, the two provisions in no way clash with each other. This is an appropriate case for the accommodation suggested in *Hostetter* v. *Idlewild Liquor Corp., supra.*

We turn to the question whether section 25656 is in direct conflict with section 2000e-2 of the Civil Rights Act of 1964. (42 U.S.C.A. § 2000e-2.)

Section 2000e-2(a) makes it unlawful to hire or to "limit, segregate, or classify" employees in any way which would tend to deprive an employee of employment opportunities on the basis of sex.[9] Section 2000e-2(e) permits an exception only where there is a "bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise, . . ."[10]

In determining whether prohibiting women from tending bar falls within the bona fide occupational qualification exception to the federal statute, we are necessarily influenced by the guidelines promulgated by the Equal Employment Opportunity Commission. (29 C.F.R. § 1604.1.) ▆▆▆ These guidelines, which are entitled to "great deference" (*Udall* v. *Tallman* (1965) 380 U.S. 1, 16 [13 L.Ed.2d 616, 625, 85 S.Ct. 792]), state that "assumptions of the comparative employment characteristics"

[9]Section 2000e-2(a) provides: "It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

[10]Section 2000e-2(e) states in relevant part: "Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of [their] religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise, . . ."

of women in general (29 C.F.R. § 1604.1(a)(1)(i)) and "sterotyped characterizations" of the sexes (29 C.F.R. § 1604.1(a)(1)(ii)) do not warrant the application of the bona fide occupational qualification exception. Thus, under the guidelines only an individual inquiry into a particular woman applicant's qualifications, or, at most, a clearly justifiable general classification with respect to a particular job category meets the requirements of section 2000e-2.[11]

Applying the Equal Employment Opportunity Commission's guidelines, one court has stated the test of a bona fide occupational qualification is whether "all or substantially all women would be unable to perform safely and efficiently the duties of the job involved." (*Weeks* v. *Southern Bell Telephone & Telegraph Company* (5th Cir. 1969) 408 F.2d 228, 235.)

Courts, following the guidelines, have invalidated weight-lifting restrictions for women (*Bowe* v. *Colgate-Palmolive Company* (7th Cir. 1969) 416 F.2d 711; *Richards* v. *Griffith Rubber Mills, supra,* 300 F.Supp. 338; *Rosenfeld* v. *Southern Pacific Company, supra,* 293 F.Supp. 1219), hours limitations (*Caterpillar Tractor Co. v. Grabiec* (S.D.Ill. 1970) 317 F.Supp. 1304) and exclusionary job categories (*Weeks* v. *Southern Bell Telephone & Telegraph Company, supra,* 408 F.2d 228 (switchman); *McCrimmon* v. *Daley* (E.D.Ill. 1970) 2 F.E.P. Cases 971 (barmaid ordinance)). *McCrimmon* specifically held that a Chicago ordinance permitting only women liquor licensees, or the wives, daughters, sisters or mothers of licensees to tend bar conflicts with title VII of the Civil Rights Act.

Applying these standards to section 25656, we must hold that that statute is not based upon a bona fide occupational qualification necessary to the operation of a bar and is therefore in direct conflict with section 2000e-2 of the Civil Rights Act.

Certainly, as we state above, women as a class are as capable as men of mixing drinks and are permitted to do so in many states. The technical capabilities of women are not, however, at issue here. The Legislature concedes this point when it exempts women licensees and wives of male licensees from the general prohibition without regard to their capacity to prepare spirits for consumption by patrons of liquor establishments.

---

[11]"The Commission believes that [protective] State laws and regulations, although originally promulgated for the purpose of protecting females, have ceased to be relevant to our technology or to the expanding role of the female worker in our economy. The Commission has found that such laws and regulations do not take into account the capacities, preferences, and abilities of individual females and tend to discriminate rather than protect. . . ." (29 C.F.R. § 1604.1(b)(2).)

The more serious contention that a bartender must be physically strong enough to protect himself against inebriated customers and to maintain order in the bar, and that women as a class are unable to do so, must also be rejected. ▉ Whether a condition constitutes "a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise" is a matter of evidence. (*Phillips v. Martin Marietta Corp.* (1971) 400 U.S. 542 [27 L.Ed.2d 613, 91 S.Ct. 496].) The state has made no showing whatever that bartenders are endangered by their work and require physical strength, not possessed by women, for self defense and to maintain order.

The reason for the lack of such a showing is apparent. As we have pointed out, the saloon days of the Wild West are long gone. Nowadays the typical bar does not provide a setting for violence and danger, if in fact it ever did. At most, the dangers feared by the Attorney General may justify discrimination only in a particular establishment where, first, the employer can prove that such problems arise, and, second, that "substantially all women" lack the requisite strength to deal with such problems. (*Weeks* v. *Southern Bell Telephone & Telegraph Co., supra,* 408 F.2d 228, 235.) Such perils cannot serve as the basis for a blanket statewide statutory prohibition against the employment of women bartenders.

▉ We conclude that section 25656 conflicts with section 2000e-2 of the Civil Rights Act. As to those liquor licensees who employ the requisite 25 employees and otherwise come within the prohibition of section 2000e-2, section 25656 is invalid and must fall.[12]

### III. EQUAL PROTECTION

Finally, it is contended that section 25656 violates the equal protection clause of the Fourteenth Amendment to the United States Constitution and article I, sections 11 and 21, of the California Constitution[13] in that it prohibits women from tending bar unless they or their husbands hold the liquor license; but does not impose a comparable limitation on men.

We recognize that the state has particularly broad powers with respect to the manufacture of and traffic in alcoholic beverages because of the

[12]We cannot agree with the contrary reasoning in *Krauss* v. *Sacramento Inn* (E.D. Cal. 1970) 314 F.Supp. 171, nor are we bound by its holding; see, e.g., *People* v. *Luros* (1971) 4 Cal.3d 84, 91, fn. 8 [92 Cal.Rptr. 833, 480 P.2d 633]; *In re Whitehorn* (1969) 1 Cal.3d 504, 511, fn. 2 [82 Cal.Rptr. 609, 462 P.2d 361], holding that state Supreme Courts are not bound by lower federal court rulings on constitutional questions.

[13]The California and federal tests for equal protection are substantially the same. (*County of L.A.* v. *Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 389 [196 P.2d 773].)

dangers to the public health and safety inherent in their sale and use. (See *Allied Properties* v. *Dept. of Alcoholic Beverage Control* (1959) 53 Cal.2d 141, 147 [346 P.2d 737].) Nonetheless, the power of the state to regulate alcoholic beverages is necessarily subject to the demands of the equal protection clause of the Fourteenth Amendment. (See, e.g., *Seagram & Sons* v. *Hostetter, supra,* 384 U.S. 35, 50 [16 L.Ed.2d 336, 347]; *Parks* v. *Allen* (5th Cir. 1970) 426 F.2d 610, 613; *Hornsby* v. *Allen* (5th Cir. 1964) 326 F.2d 605, 609.)[14]

Before deciding whether the statute violates the equal protection clauses of the state and federal Constitutions we must determine the proper standards for reviewing the classification which the statute creates.

We have followed the two-level test employed by the United States Supreme Court in reviewing legislative classifications under the equal protection clause. (*In re Antazo* (1970) 3 Cal.3d 100, 110-111 [89 Cal.Rptr. 255, 473 P.2d 999]; *Westbrook* v. *Mihaly, supra,* 2 Cal.3d 765, 784-785; *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578-579 [79 Cal.Rptr. 77, 456 P.2d 645]; see also, Note: *Developments in the Law—Equal Protection* (1969) 82 Harv.L.Rev. 1065, 1076-1077, 1088.)

"In the area of economic regulation, the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.] [¶] On the other hand, in cases involving 'suspect classifications' or touching on 'fundamental interests,' the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [Citations.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary*

---

[14]*State Board* v. *Young's Market Co.* (1936) 299 U.S. 59, 64 [81 L.Ed. 38, 41, 57 S.Ct. 77], cited in the Attorney General's brief, is not to the contrary. In that case, the Supreme Court upheld California's license fee on imported beer against an equal protection attack, stating that "[a] classification recognized by the Twenty-first Amendment cannot be deemed forbidden by the Fourteenth." The case stands for the proposition that the power given the states under the Twenty-first Amendment to forbid or regulate importation of alcoholic beverages creates two classes of beverage, those imported from out of state and domestic beverages. (See, *Hornsby* v. *Allen, supra,* 326 F.2d 605, 609.) Since the Twenty-first Amendment creates this particular classification, and the Fourteenth and Twenty-first Amendments are of equal dignity, the classification created by the Twenty-first Amendment cannot be invalidated by the Fourteenth. The instant case does not involve the classification created by the Twenty-first Amendment.

to further its purpose." (*Westbrook* v. *Mihaly, supra,* 2 Cal.3d 765, 784-785.)

The instant case compels the application of the strict scrutiny standard of review, first, because the statute limits the fundamental right of one class of persons to pursue a lawful profession, and, second, because classifications based upon sex should be treated as suspect.

We have held that the state may not arbitrarily foreclose any person's right to pursue an otherwise lawful occupation. (*Purdy & Fitzpatrick* v. *State of California, supra,* 71 Cal.2d 566, 579.) The right to work and the concomitant opportunity to achieve economic security and stability are essential to the pursuit of life, liberty and happiness. As early as 1915, the United States Supreme Court declared that "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of [the Fourteenth] Amendment to secure." (*Truax* v. *Raich* (1915) 239 U.S. 33, 41 [60 L.Ed. 131, 135, 36 S.Ct. 7].) The California Legislature accords statutory recognition to the right to work by declaring the opportunity to seek, obtain and hold employment without discrimination a civil right. (Lab. Code, § 1411.) ▆ Limitations on this right may be sustained only after the most careful scrutiny. (*Purdy & Fitzpatrick* v. *State of California, supra,* 71 Cal.2d 566, 579; cf. *Allgeyer* v. *Louisiana* (1897) 165 U.S. 578, 589-590 [41 L.Ed. 832, 835-836, 17 S.Ct. 427]; *Truax* v. *Raich, supra,* 239 U.S. 33, 41; *Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 169, fn. 4, 169-170 [65 Cal.Rptr. 297, 436 P.2d 297]; *Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 235 [18 Cal.Rptr. 501, 368 P.2d 101].) ▆ Bartending and related jobs, though carefully regulated, are lawful occupations and the strict standard of review is therefore justified on this ground.

We find that strict review is also required because of the characteristic upon which the classification in the statute is based. The United States Supreme Court has not designated classifications based on sex "suspect classifications" requiring close scrutiny and a compelling state justification for their constitutionality.[15] Nonetheless, courts have begun to treat

---

[15]See, e.g., *Goesaert* v. *Cleary* (1948) 335 U.S. 464 [93 L.Ed. 163, 69 S.Ct. 198], and *Muller* v. *Oregon* (1908) 208 U.S. 412 [52 L.Ed. 551, 28 S.Ct. 324], both of which were decided well before the recent and major growth of public concern about and opposition to sex discrimination. No judge today would justify classification based on sex by resort to such openly biased and wholly chauvinistic statements as this one made by Justice Brewer in *Muller:* "[H]istory discloses the fact that woman has always been dependent upon man. He established his control at the outset by superior physical strength, and this control in various forms, with diminishing intensity, has continued to the present. As minors, though not to the same extent, she

sex classifications as at least marginally suspect (see, e.g., *Commonwealth v. Daniel* (1968) 430 Pa. 642 [243 A.2d 400, 402-403]; Note: *Longer Sentence for Females* . . . (1969) 82 Harv.L.Rev. 921, 923), and one federal district court has explicitly recognized these classifications as such. (*United States v. York* (D.Conn. 1968) 281 F.Supp. 8, 14.)

An analysis of classifications which the Supreme Court has previously designated as suspect reveals why sex is properly placed among them.[16] Such characteristics include race (see, e.g., *Loving v. Virginia* (1967) 388 U.S. 1, 9 [18 L.Ed.2d 1010, 1016, 87 S.Ct. 1817]; *McLaughlin v. Florida* (1964) 379 U.S. 184, 191-192 [13 L.Ed.2d 222, 227-229, 85 S.Ct. 283]), lineage or national origin (see, e.g., *Korematsu v. United States* (1944) 323 U.S. 214, 216 [89 L.Ed. 194, 198-199, 65 S.Ct. 193]; see also *Sei Fujii v. State of California* (1952) 38 Cal.2d 718, 730 [242 P.2d 617]), alienage (*Takahashi v. Fish Comm.* (1948) 334 U.S. 410, 420 [92 L.Ed. 1478, 1487-1488, 68 S.Ct. 1138]; *Truax v. Raich, supra,* 239 U.S. 33; *Purdy & Fitzpatrick v. State of California, supra,* 71 Cal.2d 566, 579), and poverty, especially in conjunction with criminal procedures (see, e.g., *Douglas v. California* (1963) 372 U.S. 353, 356-357 [9 L.Ed.2d 811, 814-815, 83 S.Ct. 814]; *Griffin v. Illinois* (1956) 351 U.S. 12, 17 [100 L.Ed. 891, 898, 76 S.Ct. 585]; see also, *In re Antazo, supra,* 3 Cal.3d 100).

Sex, like race and lineage, is an immutable trait, a status into which the class members are locked by the accident of birth. What differentiates sex from nonsuspect statuses, such as intelligence or physical disability, and aligns it with the recognized suspect classifications is that the characteristic frequently bears no relation to ability to perform or contribute to society. (See Note: *Developments in the Law—Equal Protection, supra,* 82 Harv.L.Rev. 1065, 1173-1174.) The result is that the whole class is relegated to an inferior legal status without regard to the capabilities or characteristics of its individual members. (See *Karczewski v. Baltimore and Ohio Railroad Company* (N.D.Ill. 1967) 274 F.Supp. 169, 179.) Where the relation between characteristic and evil to be prevented is so tenuous, courts must look closely at classifications based on that characteristic lest outdated social stereotypes result in invidious laws or practices.

has been looked upon in the courts as needing especial care that her rights may be preserved. . . . Though limitations upon personal and contractual rights may be removed by legislation, there is that in her disposition and habits of life which will operate against a full assertion of those rights. . . . Doubtless there are individual exceptions . . . but looking at it from the viewpoint of the effort to maintain an independent position in life, she is not upon an equality." (*Id.,* at pp. 421-422 [52 L.Ed. at p. 556].)

[16] See also Note, *Sex Discrimination and Equal Protection: Do We Need a Constitutional Amendent?* (1971) 84 Harv.L.Rev. 1499, 1506-1516, for a recent and excellent analysis of the proper standard of review of classifications based on sex.

Another characteristic which underlies all suspect classifications is the stigma of inferiority and second class citizenship associated with them. (See Note: *Developments in the Law—Equal Protection, supra*, 82 Harv. L.Rev. 1065, 1125-1127.) Women, like Negroes, aliens, and the poor have historically labored under severe legal and social disabilities. Like black citizens, they were, for many years, denied the right to vote[17] and, until recently, the right to serve on juries in many states.[18] They are excluded from or discriminated against in employment and educational opportunities.[19] Married women in particular have been treated as inferior persons in numerous laws relating to property and independent business ownership and the right to make contracts.[20]

[17]The Nineteenth Amendment which gave women the right to vote in national elections was not passed until 1920. Women remain underrepresented in federal and state legislative bodies and in political party leadership. (See, e.g., American Women, Report of the President's Commission on the Status of Women, *supra*, pp. 46-52; *Calderon* v. *City of Los Angeles* (1971) 4 Cal.3d 251, 258, fn. 6 [93 Cal.Rptr. 361, 481 P.2d 489].)

[18]Women became eligible to serve on all federal juries only by virtue of the Civil Rights Act of 1957. It now appears that women may not be denied the right to serve on a jury (*White* v. *Crook* (M.D.Ala. 1966) 251 F.Supp. 401, 408), but the United States Supreme Court has held that a state may relieve women from jury service unless they seek it out. (*Hoyt* v. *Florida* (1961) 368 U.S. 57 [7 L.Ed.2d 118, 82 S.Ct. 159].)

[19]The President's Task Force on Women, relying on figures provided by the Bureau of the Census and the Bureau of Labor Statistics, reported the following: "Sex bias takes a greater economic toll than racial bias. The median earnings of white men employed year-round full-time is $7,396, of Negro men $4,777, of white women, $4,279, of Negro women $3,194. Women with some college education, both white and Negro, earn less than Negro men with 8 years of education. [¶] Women head 1,723,000 impoverished families, Negro males head 820,000. One-quarter of all families headed by white women are in poverty. More than half of all headed by Negro women are in poverty. Less than a quarter of those headed by Negro males are in poverty. Seven percent of those headed by white males are in poverty. [¶] The unemployment rate is higher among women than men, among girls than boys. More Negro women are unemployed than Negro men, and almost as many white women as white men are unemployed (most women on welfare are not included in the unemployment figures—only those' actually seeking employment.)" (A Matter of Simple Justice: The Report of The President's Task Force on Women's Rights and Responsibilities (1970) p. 18; see also, Kanowitz, Women and The Law, *supra*, pp. 100-101; Murray & Eastwood, *Jane Crow and the Law: Sex Discrimination and Title VII* (1965) 34 Geo.Wash.L.Rev. 232, 234.)

The President's Commission on Women reports that "substantial discrimination [in education] does exist." It cites higher admission standards for women than men not only in graduate school but in undergraduate schools as well. It states that "Discrimination in education is one of the most damaging injustices women suffer. It denies them equal education and equal employment opportunity, contributing to a second class self image." (A Matter of Simple Justice: The Report of The President's Task Force on Women's Rights and Responsibilities, *supra*, p. 7; see also American Women: Report of the President's Commission on the Status of Women, *supra*, p. 11.)

[20]See, e.g., Kanowitz, Women and The Law, *supra*, pp. 35-99; American Women: Report of the President's Task Force on Women's Rights and Responsibilities, *supra*,

Laws which disable women from full participation in the political, business and economic arenas are often characterized as "protective" and beneficial. Those same laws applied to racial or ethnic minorities would readily be recognized as invidious and impermissible. The pedestal upon which women have been placed has all too often, upon closer inspection, been revealed as a cage. ▇▇▇ We conclude that the sexual classifications are properly treated as suspect, particularly when those classifications are made with respect to a fundamental interest such as employment.

We now consider whether the state has established a compelling state interest. A number of state interests have been urged for the classification created by the statute. Two Court of Appeal cases which uphold section 25656 against equal protection challenge (*Hargens* v. *Alcoholic Bev. etc. App. Bd.* (1968) 263 Cal.App.2d 601 [69 Cal.Rptr. 868]; *People* v. *Jemnez* (1942) 49 Cal.App.2d Supp. 739 [121 P.2d 543]) suggest two interests served by the statute; first that women who do not have an interest by way of ownership or marriage in the liquor license will not be sufficiently restrained from committing "improprieties," and, second, that women bartenders would be an "unwholesome influence" on young people and the general public.

The first rationale rests upon the peculiar and wholly unacceptable generalization that women in bars, unrestrained by husbands or the risk of losing a liquor license, will commit improper acts. This rationale fails as a compelling state interest because it is wholly arbitrary and without support in logic or experience.

There is no reason to believe that women bartenders would have any less incentive than male bartenders to obey the laws governing the sale of alcoholic beverages and the rules set down by their employers in order to retain their jobs and promote their own well-being. Nor is there any basis for presuming that male licensees, charged with overseeing their establishments and carrying out their responsibilities under the law, would be less able to carry out these responsibilities with respect to women bartenders than to the male bartenders or female cocktail waitresses the law permits them to hire.

▇▇▇ The Legislature may, of course, pass laws to prevent "improprieties" in connection with the sale of alcoholic beverages. It has, in fact, passed laws aimed at the very evils which section 25656 allegedly prevents. (See, e.g., Bus. & Prof. Code, § 25657, which makes it a misde-

p. 47; cf., The California Sole Trader Statute, Code of Civil Procedure sections 1811-1821, which requires court approval before a wife may engage in an independent business.

meanor to employ anyone to encourage the purchase of alcoholic beverages; § 24200 which permits license revocation when continuation of the license would be contrary to public welfare or morals; and § 25601 which makes it a misdemeanor to keep a disorderly house.) ▮ Where the evil which the Legislature seeks to prevent can be directly prevented through nondiscriminatory legislation, and where the class singled out by the Legislature has no necessary connection with the evil to be prevented, the statute must be struck down as an invidious discrimination against that class.

▮ The second rationale—that women bartenders would be an "unwholesome influence" on the public—is even weaker than the first. The claim of unwholesomeness is contradicted by statutes which permit women to work as cocktail waitresses, serve beer and wine from behind a bar (Bus. & Prof. Code, § 25655), or tend bar if they or their husbands hold a liquor license. The objection appears to be based upon notions of what is a "ladylike" or proper pursuit for a woman in our society rather than any ascertainable evil effects of permitting women to labor behind those "permanently affixed fixtures" known as bars. Such notions cannot justify discrimination against women in employment.

*Hargens* v. *Alcoholic Bev. etc. App. Bd., supra,* 263 Cal.App.2d 601 and *People* v. *Jemnez, supra,* 49 Cal.App.2d Supp. 739, to the extent that they conflict with the views stated herein, are disapproved.

Finally, the Attorney General argues that this case is governed by *Goesaert* v. *Cleary, supra,* 335 U.S. 464, which held constitutional a Michigan statute forbidding any female to act as bartender unless she was the wife or daughter of the male owner of a licensed liquor establishment. The rationale for the classification in that case was that the "oversight assured through ownership of a bar by a barmaid's husband or father minimizes hazards that may confront a barmaid without such protecting oversight." (*Id.,* at p. 466 [93 L.Ed. at p. 166].) This holding ignores the obvious objection, raised in the dissent, that a male owner, although he is always absent from his bar, may employ his wife and daughter while a female owner may not work in a bar or employ her daughter even though a man is always present to keep the order.

Although *Goesaert* has not been overruled, its holding has been the subject of academic criticism (Kanowitz, Women and The Law, *supra,* pp. 33-34; Oldham, *Sex Discrimination and State Protective Laws* (1967) 44 Denver L.J. 344, 373-374); and its sweeping statement that the states are not constitutionally precluded from "drawing a sharp line between the sexes" (*Goesaert* v. *Cleary, supra,* 335 U.S. at p. 466 [93 L.Ed. at p. 165]) has come under increasing limitation. (See *Paterson Tavern & G. O. A.*

v. *Borough of Hawthorne, supra,* 57 N.J. 180, 186 [270 A.2d 628, 630-631]; *Seidenberg* v. *McSorleys' Old Ale House, Inc.* (S.D.N.Y. 1969) 308 F.Supp. 1253, 1260; *United States* v. *York, supra,* 281 F.Supp. 8, 16; *White* v. *Crook, supra,* 251 F.Supp. 401, 408.)

We need not, however, speculate as to the continuing validity of *Goesaert.* The rationale for upholding the statute in that case cannot sustain our statute. Section 25656 does not preclude all women from being bartenders or prohibit them from bartending except where they are under the supervision of a male relative. It permits a female owner or sole shareholder to tend bar. The classification made by the section thus cannot be justified on the basis of the protection of female bartenders by their male relatives and we can think of no other legitimate state purpose to which it is rationally related. (See *McCrimmon* v. *Daley* (7th Cir. 1969) 418 F.2d 366, 369-370, which distinguishes *Goesaert* where a Chicago ordinance permitted a female licensee and her female employee to tend bar.)

We conclude that the classification created by section 25656 is invidious and wholly arbitrary. The state has not only failed to establish a compelling interest served by it, but it has failed to establish any interest at all. Section 25656 is unconstitutional under the equal protection clauses of the state and federal Constitutions.

For the reasons stated, we find section 25656 invalid. Let the peremptory writ of mandate issue compelling the Director of the Department of Alcoholic Beverage Control to cease license revocation proceedings based upon section 25656 of the Business and Professions Code and to cease enforcement of the section.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.