**UNITED STATES of America,
Plaintiff,**

**v.**

**George Kenneth REISER, Defendant.**

**Crim. No. 4517.**

United States District Court,
D. Montana,
Butte Division.

May 16, 1975.

Otis L. Packwood, U. S. Atty., Billings, Mont., Helena S. Maclay, Asst. U. S. Atty., Butte, Mont., for plaintiff.

James H. Goetz, Bozeman, Mont., for defendant.

## ORDER

WILLIAM D. MURRAY, Senior District Judge.

The defendant in this case, George Kenneth Reiser, has been indicted under 50 App. U.S.C. § 462 for failure to submit to induction into the armed forces. The defendant's induction has been sought pursuant to the general Selective Service Laws of the United States, including 50 App. U.S.C. §§ 453 and 454 which provide for the registration, induction and training of male citizens only. The defendant, by way of a motion to dismiss, contends that this statutory scheme under which the United States has attempted to induct and now prosecute the defendant "establishes a sex-based classification which burdens and penalizes members of one sex and not the other." As a result the defendant maintains that his Constitutional rights to due process and equal protection, guaranteed him by the Fifth Amendment, have been violated. The Fifth Amendment of the Constitution prohibits the federal government from depriving *any person* of "life, liberty, or property, without due process of law." By virtue of this amendment, the federal government may also not deny any person the equal protection of the laws.[1] Women are, of course, "persons" but we have over the years legally discriminated between men and women for many reasons, some of which are justifiable, and others not.

Historically, in the western world at least, a woman's role has been cast as wife and mother; her place has been in the home.[2] Until recently the courts have done little to alter that conception, and have actively fostered this paternalistic approach. As one Supreme Court justice stated nearly a century ago: "The paramount destiny and mission of woman are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator." Bradwell v. Illinois, 16 Wall. 130, 141, 83 U.S. 130, 21 L.Ed. 442 (1873) (Bradley, J., concurring). Although many of the efforts to create a separate legal status for women undoubtedly stem from a good faith attempt to advance the interests of women, they all to often backfire to the economic and social detriment of women. This paternalism is especially prominent in the military, perhaps the most male dominated institution in society.[3] For example, besides being ex-

1. The Fifth Amendment due process clause imposes against the federal government, restrictions against discriminatory class legislation comparable to those imposed on the states by virtue of the Fourteenth Amendment equal protection clause. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

2. Such stereotyped notions are simply no longer supported by statistics. *See* Taylor v. Louisiana, 419 U.S. 522, 535, n. 17, 95 S. Ct. 692, 42 L.Ed.2d 690 (1975). The eradication of stereotypes was also supported in Stanton v. Stanton, — U.S. —, —, 95 S.Ct. 1373, 1378, 43 L.Ed.2d 688 (1975), where the court declared:

No longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas. . . . Women's activities and responsibilities are increasing and expanding. . . . The presence of women in business, in the professions, in government and, indeed, in all walks of life where education is desirable, if not always a necessary antecedent, is apparent and a proper subject of judicial notice.

3. For an excellent review of the disparities in the treatment of men and women in the military *see*, The Equal Rights Amendment and the Military, 82 Yale L.J. 1533 (1973).

cluded from the draft, women cannot constitute more than two percent of army personnel.[4] The rationale underlying such an approach has been expressed by one court in the following manner: "[I]f a nation is to survive, men must provide the first line of defense while women keep the home fires burning." U. S. v. St. Clair, 291 F. Supp. 122, 125 (S.D.N.Y.1968).

The draft, resulting in compulsory military service, is one of the most serious and onerous duties of citizenship. The Supreme Court has stated that "the duty of citizens by force of arms to defend our government against all enemies whenever necessity arises is a fundamental principle of the Constitution." United States v. Schwimmer, 279 U.S. 644, 650, 49 S.Ct. 448, 450, 73 L. Ed. 889 (1929). Although women have made great strides in removing the vestiges of sex discrimination in many areas of the law, they will never accomplish total equality unless they are allowed to accept the concomitant obligations of citizenship. Brown, Emerson, Falk & Freedman, The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women, 80 Yale L.J. 871, 873–74 (1971). Discriminatory treatment in one area of the law is bound to be reflected in other areas. Indeed, the drafting of women into the military has been the worst of the "parade of horribles" utilized as grounds for denial of sexual equality in considering the proposed Equal Rights Amendment. Although military service can provide a number of benefits, the requirements of serving in the armed forces will undoubtedly be an unpleasant experience for many women; but it is an equally unattractive experience for many men. Such men have a vital interest in sexual equality, as the addition of women to the draft pool substantially decreases the statistical likelihood of individual men being subject to the draft.

In enacting the Military Selective Service Act of 1967, Congress declared it the policy of Congress "that in a free society the obligations and privileges of serving in the armed forces and the reserve components thereof *should be shared generally*, in accordance with a system of selection which is fair and just, and which is consistent with the maintenance of an effective national economy." (Emphasis added). 50 App. U.S.C. § 451(c).

## I. *The Two-tiered Equal Protection Test*

In deciding whether or not the legislation establishing an all male draft is a violation of the Constitution, it is necessary to consider what justification exists for sex-based discrimination and what standard the courts have applied in determining the constitutionality of such discrimination.

### A. *Rational Basis test*

The older standard formulated by the Supreme Court, known as the "rational basis" test, requires a *rational relationship* between the *interest* which the state is trying to promote (i. e., its "objective") and the *classification* or means which the state utilizes to attain that end. McGowen v. Maryland, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 6 L.Ed. 2d 393 (1960). When a government enactment affects different groups of people differently, the classification of these groups must be reasonable in order to justify the discriminatory treatment. "One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S. Ct. 337, 340, 55 L.Ed. 369 (1911). The

---

4. *Id.* 10 U.S.C. § 3209 (1964) mandated that women could not constitute more than 2% of the full strength of all the services. The act was amended in 1967 [Act of Nov. 8, 1967, Pub.L.No.90–130 § 1(9)(E), 81 Stat. 375] to permit the Secretary of Defense to determine the limits 10 U.S.C. § 3209(b) (Supp. 1974). The two percent limitation still exists by regulation in the army. 32 C.F.R. § 580.4(b) (1974).

lines drawn need not be mathematically precise, and a "statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowen, supra* 366 U.S. at 426, 81 S.Ct. at 1105. Using this test, then, the court need ask itself only two questions: 1) Does the statute have a permissible purpose? 2) Do the classifications drawn have a reasonable relation to this purpose?

### B. *Strict scrutiny test*

■ Strict scrutiny, the more recently evolved equal protection test, is triggered whenever either a *fundamental interest* [*see e. g.*, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)] is at stake or the government has employed a *suspect classification.* Suspect classifications are based on a person's status. The more immutable the characteristics are upon which the classification is based, the more likely they will be held to be suspect. See note: Developments in the Law—Equal Protection, 82 Harv. L.Rev. 1065, 1126–27 (1969); *See e. g.*, Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948). Thus under circumstances when a suspect classification or fundamental interest is involved, the court will exercise strict scrutiny and the government must present a *compelling interest* before the classification will be held justified. *Shapiro, supra* 394 U.S. at 634, 89 S.Ct. 1322. The distinctions drawn must also be necessary to accomplish the state's purpose (See n. 9 *infra*).

### II. *The Strict Scrutiny Test Applies*

### A. *Sex a suspect classification*

■ The defendant has argued that the strict scrutiny test ought to be applied to the draft because the sexual distinctions in the legislation which make him subject to induction are suspect classifications. After a close look at the rationale behind the "suspect classifica-

tion" designation, the court agrees with the defendant; sex is a suspect classification.

An examination of those traits which have been held to be suspect in the past provides a basis for understanding why some classifications are inherently invidious. The Supreme Court has refused to let stand classifications based on race [*see e. g.*, Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)], alienage [*see e. g.*, Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Takahashi v. Fish & Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915)], and national origin [*see e. g.*, Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948); Korematsu v. U. S., 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); Hirabayashi v. U. S., 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943)].

Characteristics which are unalterable, such as race or national origin, are likely to be held suspect. Frontiero v. Richardson, 411 U.S. 677, 682–88, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); Sail'er Inn, Inc. v. Kirby, 5 Cal.3d 1, 95 Cal. Rptr. 329, 485 P.2d 529, 538–41 (1971). *See also* Note, Developments in the Law —Equal Protection, 82 Harv.L.Rev. 1065, 1173–77 (1969); Note, Are Sex-based Classifications Constitutionally Suspect?, 66 N.W.U.L.Rev. 481, 493–95 (1971). In a society which proclaims the equality of individuals, it is anomalous that some persons be accorded a more or less favorable status because of immutable characteristics, determined by an accident of birth. Suspect traits are generally highly visible, and thus persons who can be easily identified by some common external characteristics, are in particular danger of being subject to class legislation. The inequities

arise when the classifying trait is unrelated to merit. "What differentiates sex from nonsuspect statuses, such as intelligence or physical disability, and aligns it with the recognized suspect classifications is that the characteristic frequently bears no relation to the ability to perform or contribute to society." Sail'er Inn, *supra*, 95 Cal.Rptr. 329 at 340, 485 P.2d at 540.

A close examination is warranted when experience indicates that the correlation between the classification and the performance in question is based on generalities which are not grounded in factual determinations but rather upon stereotyped conclusions about "the nature of things." Analogies between race and sex are educational in this respect:

> The similarities between race and sex discrimination are indeed striking. Both classifications create large, natural classes, membership in which is beyond the individual's control; both are highly visible characteristics on which legislators have found it easy to draw gross, stereotypical distinctions. Historically, the legal position of black slaves was justified by analogy to the legal status of women. Both slaves and wives were once subject to the all-encompassing paternalistic power of the male head of the house. Arguments justifying different treatment for the sexes on grounds of female inferiority, need for male

protection, and happiness in their assigned roles bear a striking resemblance to the half-truths surrounding the myth of the "happy slave." The historical patterns of race and sex discrimination have, in many instances, produced similar present day results. Women and blacks, for example, hold the lowest paying jobs in industry, with black men doing slightly better than white women. [Note, Sex Discrimination and Equal Protection: Do We Need a Constitutional Amendment? 84 Harv.L.Rev. 1499, 1507–1508 (1971)].

Not only have women and blacks suffered inequities in employment, but for years they were denied the right to vote [5] and the right to serve on juries in many states.[6] Married women in particular have been subject to abuses through laws restricting their right to contract and their property rights. See Brown, Emerson, Falk & Freedman, The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women, 80 Yale L.J. 871 (1971); L. Kanowitz, Women and the Law: The Unfinished Revolution 35–99 (1960). The judgments underlying the assignment of women to an inferior status, like those underlying racial distinctions, have frequently been based on inaccurate stereotypes.[7] In view of the misjudgments made about the performances and capabilities of women in the past, any continuing distinctions based on sex (like

---

5. The 19th Amendment to the U. S. Constitution, granting women the right to vote, was not passed until 1920. It is not surprising that given the political history of this nation, women are grossly underrepresented in the "Nation's decision-making counsels." See Frontiero v. Richardson, 411 U.S. 677, 686, n. 17, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

6. As recently as 1961, the Supreme Court held that it was not a violation of equal protection or due process to deny women an equal opportunity for selection on a jury. Hoyt v. Florida, 368 U.S. 57 (1961). It was only this year that the Supreme Court held that it was unconstitutional (relying heavily on the defendant's sixth amendment rights) to exclude women or give them automatic exemptions based solely on sex. Taylor

v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

7. *See e. g.*, n. 2 *supra*. Another example of the manifestation of stereotyped views is the state "protective" labor legislation (limiting hours women could work or weights they could lift, etc.). Although hailed in its time as progressive, such legislation has since proved to be unbased in fact regarding actual capabilities of women and therefore has been disadvantageous to women. Many protective labor laws are now being held to conflict with Title VII of the Civil Rights Act of 1964. *See e. g.*, Rosenfeld v. Southern Pacific Co., 444 F.2d 1219 (9th Cir. 1971); Weeks v. Southern Bell Telephone & Telegraph Co., 408 F.2d 228 (5th Cir. 1969).

those of race) should bear a heavy burden of proof.

### B. *No compelling interest has been demonstrated*

Having decided that sex is a suspect classification, the court now turns to consider whether the government has established a "compelling interest" which justifies the discriminatory treatment. Before launching into a discussion on this issue, however, it is absolutely vital that we isolate just what it is that must be justified. It is essential to point out that we are *not* questioning nor doubting Congressional authority to "raise and support armies," (U. S. Constitution, Art. I § 8, cl. 12) nor even to submit citizens of the United States to involuntary service in those armed forces. The issue on which this court now focuses is whether Congress should be allowed to conscript only men.

■ A number of Supreme Court decisions lend support for narrowing the issue in the manner suggested. For example, in McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), the court was faced with a Florida fornication statute which provided much heavier penalties for parties of different races than for parties of the same race. In striking down this legislation, the court specifically recognized the interests of the state to legislate with regard to "illicit extramarital and premarital promiscuity." *Id.* 379 U.S. at 193, 85 S.Ct. at 289. What it rejected was the scheme imposing varied penalties based on racial classification. Likewise, neither in Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) nor Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), did the Supreme Court question that the statutes promoted legitimate government interests—with the exception of the classifications by sex. For example, in *Frontiero* the court was reviewing legislation regarding housing, medical, and dental benefits for members of the armed forces (and their dependents). The court was not doubting

Congress's authority to grant such benefits in general, but rather the inquiry focused on the difference in the treatment of men and women in determining eligibility for such benefits. In *Reed* the court dealt with the constitutionality of an Idaho probate code provision that gave a "mandatory" preference to men over women (when both were in the same degree of relation to the decedent) in determining who would administer the decedent's estate. The court in that case specifically noted that "[c]learly the objective of reducing the workload on probate courts by eliminating one class of contests is not without some legitimacy." *Id.* 404 U.S. at 76, 92 S.Ct. at 254. The crucial question, however, was whether the statute advanced that objective in accordance with the command of the equal protection clause. *See also,* James v. Strange, 407 U.S. 128, 141, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972); Weber v. Aetna Casualty and Surety Co., 406 U.S. 164, 173, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); Shapiro v. Thompson, 394 U.S. 618, 633, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). It is the position of this court that while a system of involuntary conscription may be necessary to satisfy certain compelling government needs, it does not follow that the visitation of this burden on only half of the eligible population is essential to the accomplishment of the statute's purpose. The government has a burden of establishing that the *gender-based classification* employed here satisfies a compelling state interest.

■ The major argument offered by the government as a compelling interest justifying the sexual classifications in the draft laws is based on "national security," and that the same interest justifies a congressional determination of which individuals should be conscripted to meet the purpose of national security. We have had too much recent experience to allow the mere claim of "national security" to stand without challenge. Although there is dicta in a recent Supreme Court decision, Schlesinger

**1066**

v. Ballard,[8] which might be read to support plaintiff's position that complete deference should be accorded Congressional judgment in military matters, this court cannot believe that the Supreme Court in *Ballard* intended to cut off all review of legislation relating to "national security." Perhaps this point can be better illustrated by citing an analogy to the instant case. If Congress passed legislation drafting only black men, under the guise of promoting "national security," it would be ludicrous to say that such legislation was beyond judicial review. This is exactly the kind of issue we are dealing with here. The government must do more than mumble "national security" and expect a veil of immunity; the government is required to show just how national security would be threatened if qualified women were drafted. This conclusion can be based on the same rationale and authority presented above on the question of determining exactly what must be justified by a compelling interest.[9]

The government has put forth some arguments to explain the potential harm to national security if women were involuntarily conscripted. The arguments center around the innate physical attributes of women which render them inadequate for service. The government contends that combat situations often place a premium upon speed, strength, and endurance—capabilities which men can more effectively develop than most women. Only a limited number of women would be as suited as men for combat assignments, and in order to assure that sufficient numbers of combat qualified soldiers were members of the

---

8. 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975). In *Ballard* the Supreme Court upheld the constitutionality of the statutes providing differing treatment of men and women in the United States Navy with respect to promotion and discharge. The dicta referred to in *Ballard* reads as follows:

 This Court has recognized that "it is the primary business of armies and navies to fight or to be ready to fight should the occasion arise." United States ex rel. Toth v. Quarles, 350 U.S. 11, 17 [76 S.Ct. 1, 5, 100 L.Ed. 8] (1955). See also Orloff v. Willoughby, 345 U.S. 83, 94 [73 S.Ct. 534, 540, 97 L.Ed. 842] (1953). The responsibility for determining how best our armed forces shall attend to that business rests with Congress, see U.S. Constitution, Art. I, § 8, cls. 12–14, and with the President. See U.S. Constitution, Art. II, § 2, cl. 1. We cannot say that, in exercising its broad constitutional power here, Congress has violated the Due Process Clause of the Fifth Amendment. [*Id.* U.S. at 510, 95 S. Ct. at 578]

 This last sentence is significant in that it indicates the court's recognition, even in military matters, of Constitutional limits on Congressional power. The *Ballard* court after reviewing the legislation in question determined that the disparate treatment of men and women naval officers did not result merely from administrative or fiscal convenience. The court concluded that variances in the promotional policy of the Navy could be justified because male and female officers were "not similarly situated" with respect to opportunities for professional service. The case at bar can be distinguished because similarly situated individuals (qualified men and women) are treated unequally under the legislation in question.

9. Pp. 7–8 *supra.* Under the compelling interest test, the distinctions drawn must be necessary to accomplish the state's purpose, in addition to being of such import so as to constrain the court to give governmental interests a higher priority than competing interests. See e. g., Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). In *Bates* the court required the government to demonstrate a compelling interest to justify disclosure of N.A.A.C.P. membership lists. The court stated:

 It was as an adjunct of their power to impose occupational license taxes that the cities enacted the legislation here in question. *But governmental action does not automatically become reasonably related to the achievement of a legitimate and substantial government purpose by mere assertion* in the preamble of the ordinance. When it is shown that state action threatens significantly to impinge upon constitutionally protected freedom it becomes the duty of this Court to determine whether the action bears a reasonable relationship to the achievement of the governmental purpose asserted as its justification. [Emphasis added.] *Id.* 361 U.S. at 525, 80 S.Ct. at 417.

 *See also,* Kramer v. Union School Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

armed forces, Congress would have to send most of the women of eligible age through the induction process in order to find the qualified few, and it would be unreasonable to disrupt the lives of millions in order to find a very few.

The government's approach here is inadequate for two reasons. First, the government has in no way established that only a few women would be qualified; no evidence whatsoever has been submitted in support of this conclusion attempting to justify sex discrimination. Secondly, the crux of the government's argument here is that because some women are incapable of service, all women may be automatically excluded from the draft and branded with the irrebuttable presumption [10] that they can never effectively meet the standards of performance necessary for satisfactory service. This is nothing more than the "administrative convenience" justification which has clearly been struck down by the Supreme Court. We know that all men are not capable of combat service—those that are not are assigned by the military to other positions in the force just as women could be.

There is simply no basis for concluding that all or even a significant number of women are incapable of serving in the military. This is true even assuming that they would be placed in combat roles. It should be understood that the nature of combat today is highly mechanized. As stated by Professor Kanowitz and M. Hale in their article Women and the Draft: A Response to Critics of the Equal Rights Amendment, 23 Hastings L.J. 199, 203 (1971):

> Perhaps the most important factor facilitating the effective use of women in the armed forces is the technological revolution in warfare that has taken place over the last generation. The changes include the use of bombs, missiles, and high-powered guns which minimize the strength required and maximize the precision and technological ability needed. Such changes make women more fit to wage war than ever before. In fact technology would seem to be moving toward making the traditional warrior obsolete and the technician all important.

The change in the nature of combat relates to another factor which bears on the capability of women to serve. The modern military machine has become increasingly dependent upon massive logistical support. Even during the American participation in the Viet Nam war, approximately only 15% of the United States armed forces personnel actually served in combat units.[11] Thus for every man on the front line, there is a veritable "army" of administrative, clerical, technical, logistical, medical, maintenance, and other personnel performing vital functions for which women may qualify and be assigned as well as men.

It is undeniably true that some women are not qualified to serve in the armed forces in any capacity, but is this grounds for excluding the entire class? It can also be safely said that many men are incapable of service. One 1969 study,

---

10. "[P]ermanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments." Vlandis v. Kline, 412 U.S. 441, 446, 93 S.Ct. 2230, 2233, 37 L.Ed.2d 63 (1973); *See also* Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

11. Bureau of the Census, U. S. Dep't of Commerce, Statistical Abstract of the United States 260 (1970).

Even in the basic Army infantry division nearly two-thirds of the troops serve in support capacity. Report by the Special Subcommittee on the Utilization of Manpower in the Military of the House Committee on Armed Services, 92d Congress, 2d Session, 14658 (June 28, 1972). In addition, statistics indicate that for the year 1971, less than 1% of the men who were actually eligible for the draft in that year were inducted and subsequently assigned to a combat unit. Thus if women were added to the draft pool, the statistical chance of an individual woman's being drafted and assigned to a combat unit would be negligible. 118 Cong.Rec. 43, S4390, March 21, 1972 (daily ed.).

in fact, indicated that 56.4% of all black male draftees and 43.1% of all white male draftees examined for military service were rejected. Bureau of the Census, U. S. Dep't of Commerce, Statistical Abstract 263 (1970). It has certainly not been suggested that blacks ought to be entirely exempted from the draft on the basis of these statistics. To say that qualified women are ineligible because some of their sisters are unfit is supporting exactly the kind of evil that the Constitution was designed to prohibit.

 There is a great deal of support for the court's conclusion that the government has not presented a justifiable ground for the gender-based classification in question here. The foundation for this holding is based in *Reed, supra,* and *Frontiero, supra.* As previously indicated, the Supreme Court in *Reed* acknowledged the legitimacy of Idaho's interest in reducing the workload on probate court by eliminating one class of contests. Nevertheless, a unanimous court found "arbitrary" the preference for members of one sex merely to eliminate the need for hearings on individual qualifications. The court concluded that by "providing dissimilar treatment for men and women who are thus similarly situated, the challenged section violates the Equal Protection Clause." *Id.* 404 U.S. at 77, 92 S.Ct. at 254. In *Frontiero* the court considered an equal protection challenge to federal legislation which provided that a married female member of the armed services could receive increased housing assistance and obtain for her husband medical and dental care only if she demonstrated that she was the source of the funds for more than half of her husband's living expenses. A married serviceman, however, could get these benefits regardless of whether he provided funds for more than half of his wife's living expense. The government attempted to justify the statutory system on the basis of administrative economy and convenience. Although a plurality found the statutory scheme unconstitutional on the basis of the strict scrutiny test, Justice Stewart concurred in a one sentence opinion citing *Reed.* Thus it would seem that at least a majority of the court adheres to the principal that the Constitution forbids sexual classifications only for administrative convenience. Supreme Court decisions dealing with sex discrimination since *Reed* and *Frontiero* have repeatedly reaffirmed the proposition that gender-based classifications solely for administrative convenience cannot stand.[12]

The similarly situated individuals in question here are men and women who meet the mental and physical standards (absent those of sex) for induction into the armed services. Even the government has admitted that some women are undoubtedly qualified to serve in the armed forces. Although it may be more convenient and economical to rely on an aggregate statistical judgment regarding the qualification of the classes in question, it is a denial of equal protection to the individual men and women who would otherwise be eligible. It is the "very kind of arbitrary legislative choice forbidden by the [Constitution]." *Reed, supra* 404 U.S. at 76, 92 S.Ct. 251, at 254; *Frontiero, supra* 411 U.S. at 670, 93 S.Ct.

---

12. Weinberger v. Wiesenfeld, —— U.S. ——, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); Schlesinger v. Ballard, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); Kahn v. Shevin, 416 U.S. 351, 355, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974). *See also* Stanley v. Ill., 405 U.S. 645, 656, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1971).

In each of the recent Supreme Court decisions upholding statutes treating men and women differently, the Court has found some justification other than administrative convenience. *See Kahn, supra* 416 U.S. at 355, n. 8, 94 S.Ct. 1734; *Schlesinger,* n. 8 *supra.* Although sexual discrimination was alleged in Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 2492, 41 L.Ed.2d 256 (1974), the Court found that under the statutes in question there "is no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." Thus *Geduldig* cannot really be interpreted as upholding sex-based discriminatory treatment of men and women.

1764. These sex-based classifications are unnecessary because neutral nonsexual criteria could be used to determine those individuals who could satisfy the physical and mental standards of performance. Thus the goals of the Selective Service legislation—national security maintained through the service of qualified individuals as well as the equal sharing of the privileges [13] and obligations of serving in the armed forces (50 App. U.S.C. § 451)—could be achieved without constitutionally impermissible classifications. To say that women would endanger national security even after it were determined that they were physically and mentally qualified to serve would be an indication that "national security" is merely a guise for some other consideration. That is, it would suggest that women are being excluded because of some ingrown societal repulsion to the suggestion of women abandoning their stereotyped roles.

If any justifiable basis exists for excluding women from combat assignments, still they can be assigned as are men to noncombat roles and thus men and women would be treated equally.

In that connection let it be said that I personally am an admirer of femininity. But the law does not permit us governmentally to seek to protect women paternalistically so as to relieve them from the duties, obligations and privileges of citizenship. Women, just as men, are persons and citizens, and in the scheme of government under the Constitution they must be treated as equals of men both as to their rights and obligations. It does not suffice under the Constitution to treat women kindly because we love them. We must treat them rightly because they are persons and citizens. The burdens of citizenship must be borne by all citizens.

Thus legislation limiting the draft to male citizens denies them the equal protection of the law. All citizens, male and female, must be subject to the draft on an equal basis.

Therefore, it is ordered and this does order that the motion to dismiss must be and hereby is granted, and the indictment is dismissed.

In view of the disposition of the above motion, the court need not rule on other pending motions.

---

13. For a summary of the many benefits to be obtained by military service, see Hale and Kanowitz, Women and the Draft: A Response to Critics of the Equal Rights Amendment, 23 Hastings L.J. 199 (1971); Brown,

Emerson, Falk & Freedman, The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women, 80 Yale L.J. 871, 967–970 (1971).