Bertram Harnett, J.
Like habits, old attitudes die hard. In few parts of society’s spectrum is this as evident as it is in the relationship between the sexes. While constitutional commands may force changes in overt conduct, they do not readily alter the ingrained feelings born of a lifetime’s experience. Too, there is a subtle conceptual reciprocation at work, since many constitutional decisions bear the indeterminate weight of the personal attitudes of their deciders.
In recent years, the drift of the law in courts and legislatures has been to eliminate or minimize sexual discrimination absent some rational justification or compelling State interest. Under this momentum, women have attained employment, educational, and social participatory opportunities long denied them. These changes have not come from recent Federal constitutional amendment — indeed they are bottomed on a constitutional amendment enacted more than a century ago, after the American Civil War, in the form of the Fourteenth Amendment, which speaks of entitlement to "equal protection” under the laws, and on the "due process” clause of the Fifth Amendment, which applies equal protection standards to the Federal Government. Plainly, their impetus for change has come from revised social perceptions and aroused womanhood. The movement to raise the consciousness of women to an appreciation of their true rights and their potential as functioning individuals has been distinctive and is comprehensive. Interestingly, part of the thrust of its intellectual van has been the assertion that the liberation of women implicitly carries with it the liberation of men. The apparent theory is that feminine emancipation eases the pressures on men to fulfill idealized and artificially imposed roles of masculine capability and expectation.
It would appear that prohibitions against sexual discrimina *317 tian mean what they say. You may not lawfully discriminate against women, but by the same token, you may not discriminate against men either. The edge of sex discrimination has two sides. And, there is more to it than that. Philosophically, a benevolent grant to women of legal rights unreasonably denied to men may help the women immediately affected, but the implicit condescension and maintenance of a protective stance in the end produces the attitude that somehow women are not equal to men. The plain language of the streets is that in the long run "women will not have it both ways.”
This brings us to the blatantly discriminatory and condescending New York alimony statute which allows women to collect alimony from men, but absolutely forbids men from collecting alimony from women.
The presumable justification for this state of affairs is that in the great bulk of divorces it is the woman who is economically disadvantaged, and often she has a continuing burden of child care. That factual assumption is doubtless true, but does not lead to a permissible conclusion of absolute male denial in cases where the husband is the economically deprived party, and he has the children or there are no children. Given the legal inhibition against sexual discrimination, the fact that statistically a wife is much more likely to be an alimony recipient cannot reasonably mean that a husband as a matter of law should be excluded altogether from alimony access. As in alimony provision generally, even for wives, each case and each award should stand on its own facts.
The case in point brings the issue to us rather dramatically, since the husband is an alien here without resources who by law cannot work.
Let us examine first the statutes, then the facts, and then analyze the matter in light of the principles and the authorities.
I. THE STATUTES — ALIMONY AND COUNSEL FEES
New York’s Domestic Relations Law excludes women from familial responsibilities it expects men to fulfill. A husband may be directed to support his wife "suitably” even after a divorce or annulment depending upon the needs and resources of the parties. But, a wife is never expected to so support her husband "suitably” no matter what their relative needs and resources might be.
*318 Section 236 of the Domestic Relations Law captioned "Alimony, temporary and permanent”, reads, in pertinent part: "In any action or proceeding brought (1) during the lifetime of both parties to the marriage to annul a marriage or declare the nullity of a void marriage, or (2) for a separation, or (3) for a divorce, the court may direct the husband to provide suitably for the support of the wife as, in the court’s discretion, justice requires, having regard to the length of time of the marriage, the ability of the wife to be self supporting, the circumstances of the case and of the respective parties”. (Emphasis added.)
In order to collect alimony, a spouse is customarily obligated to hire a lawyer. Accordingly, the statute provides for the award of counsel fees: "§ 237. Counsel fees and expenses (a) In any action or proceeding brought (1) to annul a marriage or to declare the nullity of a void marriage, or (2) for a separation, or (3) for a divorce, or (4) to declare the validity or nullity of a judgment of divorce rendered against the wife who was the defendant in any action outside the State of New York and did not appear therein where the wife asserts the nullity of such foreign judgment, or (5) by a wife to enjoin the prosecution in any other jurisdiction of an action for a divorce, or (6) upon any application to annul or modify an order for counsel fees and expenses made pursuant to this subdivision provided, the court may direct the husband * * * to pay such sum or sums of money to enable the wife to carry on or defend the action or proceeding as, in the court’s discretion, justice requires, having regard to the circumstances of the case and of the respective parties.” (Emphasis added.) "[Counsel fees are awarded to attorneys in matrimonial actions to insure that both parties have legal representation, and particularly an indigent [spouse]” (Alwardt v Alwardt, 41 AD2d 592). In some sense, counsel fees are just a specialized form of support. (See, e.g., Shenker v Shenker, 14 Misc 2d 980.)
II. FACTS OF THE CASE
Here, we have a husband, Mark Thaler, who cannot legally earn a living, and a citizen working wife, Bonnie Seaman Thaler, who refuses to support him.
Mark is Israeli; Bonnie is American. They were married in Israel, and came to honeymoon in America on March 13, 1976. On April 30, 1976, she commenced this action for annulment.
*319 Our immigration laws prohibit Mark, a nonimmigrant alien, from taking a job here. (8 CFR 214.1 [c].) Bonnie, on the other hand, is able to work. Mark claims she is presently employed.
Mark contests his wife’s annulment action. He cannot do that effectively from outside the country. He must remain here, but he cannot support himself here. He has turned to his wife for support and made this motion for temporary alimony and a counsel fee while their action is pending. Bonnie resists on the ground that under sections 236 and 237 of the Domestic Relations Law alimony and counsel fees are not available to a husband, only to a wife.
III. LEGAL ANALYSIS
A. Equal Protection of the Laws
The problem is one of equal protection and unequal treatment.
Both the New York State and the United States Constitutions limit the State’s power to distinguish between classes of individuals. Each provides: "No person shall be denied the equal protection of the laws of this state or any subdivision thereof.” (NY Const, art I, § 11.) "No state shall * * * deny to any person within its jurisdiction the equal protection of laws.” (US Const, 14th Arndt, § 1.)
1. Rationality as a Basis for Discrimination
By traditional analysis, the State does not necessarily deny equal protection when it discriminates against one class of people, provided the discrimination bears a reasonable relationship to some legitimate State purpose. (Alevy v Downstate Med. Center, 39 NY2d 326.) Many laws which discriminate between people based on income, intelligence, or physical disability are generally accepted. (Frontiero v Richardson, 411 US 677, 686.) Generally, the State can treat people differently as long as its action rests on a rational base. (Reed v Reed, 404 US 71; Dandridge v Williams, 397 US 471.) Rationality, as used here, however, does not mean that some vague, sentimental, or indirect reason or feeling for the rule exists; it means there is a rational relationship between the rule and a legitimate purpose meant to be served. (Frontiero v Richardson, supra, p 683.) If sexual distinction is the basic reason, it is irrational in terms of State purposes.
*320 2. Suspect Classifications (And These Include Sex)
Mere rational justification is not enough, however, when a statute treats people differently according to such "suspect” criteria as their race or national origin. (Loving v Virginia, 388 US 1; Hernandez v Texas, 347 US 475.) There, something more than mere rationality must be established.
A statute which uses a "suspect” standard to draw distinctions must be examined with strict judicial scrutiny. Only a compelling State interest will support the constitutionality of a statute making a discrimination in a suspect category.
In Frontiero v Richardson (supra), a four-Judge plurality of the Supreme Court concluded that gender as a differentiating device is a "suspect criteria.”
Other courts, often relying on the Frontiero reasoning, have termed sex a suspect criteria. New York cases include Passante v Walden Print. Co. (53 AD2d 8 [3d Dept, 1976]); Town of Pompey v Parker (53 AD2d 125 [4th Dept, 1976]); People v Siciliano (52 AD2d 408, 418 [1st Dept, 1976] opn of Lupiano, J.); and Bauer v Bauer (55 AD2d 895 [2d Dept, 1977] opn of Latham, J.).
B. Constitutional Infirmity
The New York alimony statute cannot survive constitutional examination. In excluding women from ever paying alimony, it rests on an assumption found impermissible by the Supreme Court in Frontiero v Richardson (411 US 677, supra) and Weinberger v Wiesenfeld (420 US 636): the assumption that wives may depend on their husbands for suitable support, but husbands never so depend on their wives. The flat distinction has no rational basis and beyond that is a suspect differentiation which serves no compelling State interest.
1. Weinberger v Wiesenfeld
The opinion of the United States Supreme Court in Weinberger v Wiesenfeld (supra) bears heavily on this case in two respects, both (1) as to the irrationality of the gender based distinction in denying husbands benefits under the social security system which wives get, and (2) the power of the court where a statute is rendered defective by gender discrimination to direct payments under it to a member of the excluded sex.
Under the Social Security Act, where a covered husband *321 with eligible children died, benefits were payable to his widow. (US Code, tit 42, § 402, subd [g].) But, the statute made no provision for widower husbands or fathers. Mrs. Wiesenfeld, a teacher covered under Social Security, died in childbirth leaving her husband and one son her sole survivors. The Government paid the son benefits, but told Mr. Wiesenfeld he was not eligible for subdivision (g) of section 402 benefits since they were available only to women. The husband sued seeking a declaration that subdivision (g) of section 402 was unconstitutional to the extent men and women were treated differently, and asking payment of benefits to him. A three-Judge District Court upheld him (Wiesenfeld v Secretary of Health, Educ. & Welfare, 367 F Supp 981) and the Supreme Court affirmed.
Upon reviewing the contingencies under the Social Security Law, the Supreme Court found the distinction between husband and wife to be not rational, even though the court explicitly recognized that men are more likely than women to be the primary family supporters. (Weinberger v Wiesenfeld, 420 US 636, 645, supra.)
2. No Rationality in Denying Alimony to Men Entirely, While Allowing it to Women
Sex discrimination in alimony may have had justification in legal as well as social history. As early as 1787, our Legislature provided that on divorce, "the chancellor shall and may thereupon take such order * * * touching the maintenance of the wife, or any allowance to be made to her * * * as * * * may be proper and sufficient.” (L 1787, ch 69.) At that time, all property in the marriage essentially belonged to the husband. Generally, married women could neither own nor control property. (Johnson, Sex and Property: The Common Law Tradition, The Law School Curriculum, and Developments Toward Equality, 47 NYU L Rev 1033.) As this court has previously observed, at common law the husband and wife were one, and the husband was the one. (See Repetti v Gil, 83 Misc 2d 75, 81.) A husband’s generalized duty to support his wife necessarily followed without the reverse being true. But, with the advent of the married woman’s property acts (L 1848, ch 200, §§ 1, 2) allowing married women to own and control property, any previous justification for this one-way support duty faded. With the current status of women and perceptions of equality, it disappears.
*322 Alimony in New York is a beneficial thing. It allocates the economic pressures of a broken home and keeps them from falling all on one party alone. (Phillips v Phillips, 1 AD2d 393.) The burden may in an appropriate case, such as this one, be no less compelling for the husband than for a wife. The traditional family assumption of bread-winning husband underlying the alimony statute’s sex limitations falls away when the sex roles are played by a changed cast of characters. How can the law lose sight of the simple fact that in appropriate cases husbands may need financial support just as much as wives?
The State has no rational interest in limiting alimony awards only to women. Individual need is a determinative factor in alimony. (Sleicher v Sleicher, 251 NY 366, 371; Kover v Kover, 29 NY2d 408.)
The sex discrimination in the alimony statute rests on the assumption that women may depend financially on their husbands, but men do not depend on their wives. The Supreme Court, in Frontiero v Richardson (411 US 677, supra) found this basic premise “overbroad,” “archaic,” and “not * * * tolerated under the Constitution.” (Schlesinger v Ballard, 419 US 498, 507, 508.)
Weinberger v Wiesenfeld (420 US 636, supra) teaches us that the empirical prospect of women getting benefits more often than men is not a basis for precluding men entirely.
Our present alimony statute erroneously articulates the concern only for the numerically more probable circumstance that the wife will require support. But section 236 of the Domestic Relations Law individualizes each case by directing the court, when calculating alimony, to consider "the ability of the wife to be self supporting.” A self-supporting wife may be denied alimony altogether. (Kover v Kover, supra.)
No doubt it offends the personal views of some that a man should collect support money from a woman. But, this is the essential sexism now at issue in legal and popular forums. Where a wife has the ability to be self-supporting, a court can consider that and deny alimony. Where the husband is self-supporting, the court can consider that and deny alimony. If one is impecunious or disabled, the court can take that into account. It can do for a man what it can do for a woman. It should depend in each case on the particular familial facts, and not the gender of the spouse seeking suitable support.
Here is the gist of the situation. Alimony is always an *323 individual affair; the particular facts and circumstances of relative need, standards, and resources must always be weighed. This is the case even for the wife alone. So long as each case is to be examined individually, as the law requires, no reason exists to preclude husbands. The alimony statute is not one which provides for a fixed schedule payment or allowances to a whole class (here, women), where the economic typicality of one class (woman) might rationally justify treating it differently from another class (men). From beginning to end alimony is a person-by-person thing.
3. The Alimony Statute Also Fails to Withstand the Strict Scrutiny Necessitated by its Suspect Sex Criterion
We have seen that the New York alimony statute in permitting alimony to women and not to men is discriminatory without a rational basis. It offers an arbitrary value judgment on male-female roles. Its discrimination is solely gender based. Even if one were somehow to find the utter preclusion of men to be rational, the sex distinction still fails because it is inherently "suspect,” and can be justified only by compelling State interests.
We find no compelling State interest in the discrimination here. To the contrary, we find the State’s interest is more in eliminating the distinction.
a. No Compelling State Interest Requires the Flat Preclusion of Husbands from Alimony
Neither the Attorney-General nor the wife here points to any interest of the State compelling denial of alimony rights to men.
(1) Many Instances of State Policy to Promote Sexual Equality
Every indication is that the State’s interest is compatible with alimony awards to husbands. The manifest New York legislative policy favors elimination of gender distinction in domestic relations and beyond. Section 415 of the Family Court Act provides that either spouse must support a dependent husband or wife in danger of becoming a public charge. Some other recent enactments addressed to sexual discrimination include: Subdivision 4 of section 150 and sections 870 and 891 of the Correction Law (work release for home care of *324 family now available to men as well as women; L 1976, ch 71); section 400 of the Judiciary Law (Sheriff’s posse may now include women as well as men; L 1976, ch 72); subdivisions 1 and 3 of section 32 of the General Business Law; section 148 (subd 1, par [a], subd 2, par [b]) of the General Municipal Law; subdivision 2 of section 217 and subdivision 1 of section 309 of the Military Law; subdivision 7 of section 31 of the Private Housing Finance Law; subdivision 1 of section 156 of the Public Housing Law; subdivisions 1, 2 and 3 of section 458 of the Real Property Tax Law; subdivision 3 of section 169 of the Social Services Law; subdivision (c) of section 696 of the Tax Law (all relate to benefits now available to a "surviving spouse” of a soldier or veteran, not just to a widow alone; L. 1976, ohs 63, 650); CPLR 6101 (women as well as men now subject to civil arrest; L 1976, ch 129); CPLR 5205, and CPLR 5206 (certain property of men and women judgment debtors now equally exempt from execution; L 1976, ch 129).
The Legislature in 1972 ratified the Equal Rights Amendment to the Federal Constitution prohibiting sex-based discrimination.
Court cases in this State support the apparent policy to thwart discrimination on the basis of sex. (See Matter of Patricia A., 31 NY2d 83 [1972] cut-off age for PINS treatment must be the same for boys and girls; Matter of Passante v Walden Print. Co., 53 AD2d 8 [1976], workmen’s compensation death benefits must be awarded to widows and widowers on an equal basis; Repetti v Gil, 83 Misc 2d 75 [1975], statute must not permit arrest of men for debt when women are exempt; National Organization for Women v State Div. of Human Rights, 34 NY2d 416 [1974], illegal to print sex distinctions in "help wanted” advertisements; People ex rel. Watts v Watts, 77 Misc 2d 178 [1973], father and mother entitled to equal consideration in awarding custody; People v Moss, 80 Misc 2d 633 [1975], gender .alone may not excuse women from jury duty; Bon-R Reprod. v Gift Mate, 81 Misc 2d 630, statute must not permit arrest of men when women are exempt; Gould v Gould, 82 Misc 2d 835 [1975], statute must not permit arrest of men when women are exempt; Garrett v New York State Athletic Comm., 82 Misc 2d 524 [1975], women may not be denied boxing licenses on the basis of gender alone; New York State Hairdressers Assn. v Cuomo, 83 Misc 2d 154 [1975], statute may not bar men from patronizing a hairdresser.)
The sex distinctions of the alimony statute do not promote *325 present State policy, they subvert it. For whatever motive it persists, it is plainly an anachronism rooted in sexist soil which must be pulled out. The policy of the State as evidenced by all available authority is to eliminate not continue sex discriminations.
(2) Distinction of Some Sporadic Cases
We are mindful of Steinberg v Steinberg (46 AD2d 684, app dsmd 36 NY2d 690) a 1974 decision where a husband’s application for temporary alimony and counsel fees was denied on the ground that sections 236 and 237 of the Domestic Relations Law provide these only for wives. While the court (Steinberg v Steinberg, 46 AD2d 684, 685, supra) did not discuss the constitutionality of these sections, it did mention in passing and without discussion or citation that the alimony statute’s sexual "classification is grounded upon a rational basis.” Moreover, no discussion whatsoever appeared as to the inherently suspect nature of sex discrimination, nor was any compelling State interest cited. In view of the United States Supreme Court’s subsequent decision of Weinberger v Wiesenfeld (420 US 636, supra) we believe the issue should and would be differently decided today. While nimble technicians can always find verbal symbols lexically differing under social security and alimony circumstances, the underlying basics of sexual orientation bear a philosophic identity. (Cf. Passante v Walden Print. Co., 53 AD2d 8, supra [3d Dept, 1976], decided after Steinberg, supra, holding sex to be a suspect criteria, and voiding sex based limitations on workmen’s compensation benefits.)
There are few decisions nationally involving sex distinction in alimony, because the vast number of States have already recognized the anomaly and abolished it. Besides New York, only 12 States still maintain statutes on the books restricting alimony to women, and by case law at least one of these allows husbands alimony. The bulk of those States is in the traditional South where rampant femininity is a special cultural thing. They are Alabama, Arkansas, Georgia, Louisiana, Mississippi, South Carolina, Tennessee, and to them are added only Idaho, Maine, Nevada, South Dakota, and Wyoming.
In two southern States there have been cases. Murphy v Murphy (232 Ga 352 [1974]) upheld a law permitting alimony for women only. Whitt v Vauthier (316 So 2d 202, writ den 320 So 2d 558 [La, 1975]) sustained a similar statute, but the *326 court there pointed out that in Louisiana a husband can collect alimony by case law notwithstanding the statute.
In our case, the Attorney-General intervenes in support of the statute. He echoes the contention that society’s continuing economic and employment discrimination against women places greater financial burdens on wives than on husbands following a divorce. This disparity, he claims, justifies the special alimony discrimination in favor of women and cites only Kahn v Shevin (416 US 351).
But, the general statement of a social purpose does not explain away an apparently irrational discrimination or use of a suspect criteria. As the Supreme Court said in Weinberger v Wiesenfeld (supra, p 648) "the mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme.”
Actually, Kahn v Shevin (supra) only sustained a tax exemption to all widows which was denied to all widowers on the ground that the impact of spousal loss fell more heavily on women. But, the Weinberger case rejected a similar justification for sex-related benefits as an inaccurate reflection of the Social Security statute’s true design.
While allowing alimony to dependent wives may serve the State interest, denying alimony to dependent husbands does not. The issue is not whether alimony should exist, but whether it should exist for one sex only.
Under New York’s alimony statute, it is irrelevant whether the economic consequences of divorce generally hit women harder than men. Unlike the situation in Kahn v Shevin (supra) which dealt with a flat exemption from real estate tax for a whole class of people, women, alimony fixation requires a court to consider the circumstance of the individual spouses before it. Alimony is a support notion within the principle of Weinberger, not an exemption situation.
There is another important distinction between the alimony circumstance and that in Kahn v Shevin. Real estate exemption statutes, such as in Kahn v Shevin, work generally by categories, and the reasonableness of widows as a category may present different rational problems than the necessarily case by case individual evaluation present in alimony circumstances. There may be insuperable practical difficulties in distinguishing between individual widows and widowers in determining an exemption and conceivably there may be some *327 reason to take them in a cluster of economic probability. But, there can be none where there is no aggregation, where each person is individually meted out his or her award by a Judge, in every case.
b. The Rationale of Equality of Women Excludes the Denial of Male Alimony
Mr. Justice Brennan, in Frontiero v Richardson (411 US 677, 686-687, supra) pointed out that sex is a suspect status since: "the sex characteristic frequently bears no relation to ability to perform or contribute to society. As a result, statutory distinctions between the sexes often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members.”
We have earlier mentioned the threatening effect to female equality of "benevolent” legislation. Denying alimony to men does not relieve economic discrimination against women — in the total scheme of the equality of women, it may foster it.
Society created its classical concept of woman, and cast it in law. Women were helpless and delicate, incapable of conducting worldly commerce, and too dainty to be soiled by it. (See, e.g., Bradwell v The State, 83 US 130 [1872].) Directives which respect and enforce this image have been sprinkled throughout our law. Some deny to women opportunities which men enjoy. Others shelter women from the responsibilities men are obliged to assume. Both kinds of law are offensive. One woman’s shelter is another’s trap, and perhaps her own later on. Equality knows no gradation. Special concessions are usually paid for in the long run.
C. The Court Has the Power to Direct Alimony to Husbands
The wife argues that if we find the alimony statute discriminates unconstitutionally, our only recourse is to strike the statute. We disagree.
Courts are enjoined to the maximum reasonable extent to read statutes so as to preserve their constitutionality. (People v Kaiser, 21 NY2d 86 [1967]; Matter of Bell v Waterfront Comm. of N. Y. Harbor, 20 NY2d 54, 62 [1967].) Moreover, a sudden and total elimination of alimony provision would yield chaotic and harsh results in too many family situations to *328 count. There is no common-law alimony right to fall back on. (Querze v Querze, 290 NY 13, 18 [1943]; Romaine v Chauncey, 129 NY 566 [1892]; Erkenbrach v Erkenbrach, 96 NY 456 [1884].) Total elimination of alimony would produce a much greater shock to the legislative design than spreading its availability to all dependent spouses. (See, e.g., Matter of Patricia A., 31 NY2d 83, supra [1972].) It would be a totally inappropriate response to the problem at hand.
In discriminatory situations, the court has the inherent power to remedy the discrimination. In Weinberger v Wiesenfeld (420 US 636, supra) where the Social Security statute unlawfully restricted payment to women only, the Supreme Court permitted payment to men.
Frontiero v Richardson (411 US 677, supra) considered a statute granting certain benefits to the wives of servicemen and to dependent husbands of servicewomen. The court simply read the dependency requirement out of the statute.
There are a number of New York instances where statutory discriminations have been approached judicially by simply excising the discriminatory factor. In Matter of Patricia A. (supra) a statute, subdivision (b) of section 712 of the Family Court Act, permitted a court to declare boys under 16 and girls under 18 "persons in need of supervision.” The Court of Appeals found the age-sex distinction unconstitutional and equalized the status at 16 for both boys and girls.
The statute in Passante v Walden Print. Co. (53 AD2d 8, supra [1976]) granted workmen’s compensation death benefits to widows of employees, but only widowers if they were dependents. (Workmen’s Compensation Law, § 16.) But, the court required the Workmen’s Compensation Board to award benefits to widows and widowers on an absolutely equal basis.
Bonnie Thaler finally says we should not direct her to pay alimony, but rather to pay the support required from a wife whose husband is liable to become a public charge. (Family Ct Act, § 415.) There is no representation here that Mark Thaler is even eligible for public assistance.
But, the more important questions are those of marital rights and dignity. Actually behind most alimony awards to wives is the implicit factor that if she does not get support she may become a public charge. The alimony statute provides more than this support of desperation, or the dole, it requires "suitable” support under the circumstances. If wives are entitled to "suitable” support, husbands too should be entitled *329 to "suitable” support. Husbands should not have to rely on section 415 of the Family Court Act alone. Wives are not required to do so. (Cf. Passante v Walden Print. Co., supra.)
IV. AWARD OF TEMPORARY ALIMONY AND COUNSEL FEE
Section 236 of the Domestic Relations Law provides for both temporary and permanent alimony. Under the statute, which we hold must also cover husbands, we have the discretion to award such alimony "as * * * justice requires.” The court cannot leave a husband with no apparent means of support, while his wife has significant savings and an apparent income. In the context of their marriage, he need not be reduced to a public charge, he is entitled to suitable support. This is particularly so since his wife brought him into the country.
A focal concern in setting temporary alimony is the necessity for support while the matrimonial action is pending. (Swinson v Swinson, 29 AD2d 693 [1968]); Lee v Lee, 41 AD2d 557 [1973].) Mark clearly requires such support.
22 NYCRR 699.11 requires each party to submit an "official form affidavit,” as part of an alimony application. (22 NYCRR 699.11 [a], [c] [1].) 22 NYCRR 699.11 (e) prescribes the form of the affidavit.
Mark has submitted such an affidavit. Bonnie has not. In fact, she has supplied very little of the information necessary for making an alimony award. Bonnie is deemed to have admitted the facts Mark set forth in his official form, which she could have, but failed to contradict in her own. (22 NYCRR 699.11 [c] [1], [2].)
Mark, as a nonimmigrant alien, cannot legally work in this country. Essentially, he is here as a tourist under Bonnie’s sponsorship. He has no income and no savings. He is living on the charity of friends. He claims Bonnie "works for [her] father’s corporation,” but he does not know how much she earns. She has $12,000 "cash on hand or in bank” and $3,000 in "stocks and bonds,” which he claims had been the couple’s joint property. The couple has been married less than a year and has no children. Based upon the papers, we will award Mark temporary alimony of $60 per week pending the actual trial of the annulment action.
Mark has also asked the court to direct his wife to pay his counsel fee. (Domestic Relations Law, § 237.) This statute suffers the same infirmity as the alimony statute (Domestic *330 Relations Law, § 236). It provides, "In any action * * * brought to annul a marriage * * * the court may direct the husband * * * to pay such sum or sums of money to enable the wife to carry on or defend the action”. (Emphasis added.)
The sex distinctions are as invalid here as in the alimony statute. (See Matter of Donald D. v Marcia D., 85 Misc 2d 637 [1976].) Here, too, they must be stricken. Husbands and wives must share equal eligibility for counsel fee awards.
Mark cannot afford counsel and he has not paid his attorney. Considering the unusual circumstance of this matter, and the relative needs, we will award Mark a modest interim counsel fee of $500. He may apply for a further fee to the trial court.