STEPHEN W. PETERS

*v.*

STEVEN D. NARICK, *Judge, etc.*

(No. 14776)

Decided October 2, 1980.

*Louis J. John* for petitioner.

*John C. Purbaugh* for respondent.

McGRAW, JUSTICE

In this proceeding instituted pursuant to the provisions of *W.Va. Code* 53-1-1 to 12 (1966), Stephen W. Peters petitions this Court to prohibit further proceedings by respondent Steven D. Narick, Judge of the Circuit Court for Marshall County, in an action for separate maintenance instituted by petitioner's spouse Janet L. Peters, the intervenor/respondent pursuant to *W.Va. Code* 48-2-28 (1976).[1] Petitioner contends this statute operates to deny him equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution and by Article III, Section 17 of the West Virginia Constitution. It is his position that because the section permits wives but not husbands to seek separate maintenance it is underinclusive. Therefore, petitioner con-

---

[1] Whenever a husband shall, without good and sufficient cause, have failed to provide suitable support for his wife, or have abandoned or deserted her, or if the wife shall have grounds for divorce, the court of any county that would have jurisidiction of an action for divorce between the parties, shall, at the action of the wife, whether or not a divorce be prayed for, order to the wife as alimony and separate maintenance such sum out of the husband's earnings or income as the court may determine, considering the circumstances of the parties and their stations in life, and may prohibit the husband from imposing any restraint on her personal liberty, and may free her real and personal property from possession, control or any interest of the husband; . . . .

tends any action taken by the respondent judge pursuant to this statute is in excess of that court's legitimate powers and subject to restraint by way of writ of prohibition.

> In a proper case, prohibition lies to test the constitutionality of an act of the Legislature, under Code 53-1-1 which provides that prohibition lies "as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers." Syl. pt. 1, *Morris v. Sevy*, 129 W.Va. 331, 40 S.E.2d 874 (1946); Syl. pt. 1, *Simms v. Dillon*, 119 W.Va. 284, 193 S.E. 331 (1938).

The language of *W.Va. Code* 53-1-1 remains the same today as when Syllabus Point 1 of *Simms* was written. Prohibition is a proper proceeding in which to raise this constitutional challenge to *W.Va. Code* 48-2-28 (1976).

We begin by noting this statute is not shielded from this equal protection challenge because facially it discriminates against men rather than women. It has been established in other gender-discrimination cases brought by or on behalf of men that statutes such as the one in question discriminate against both men and women. *E.g.*, Wengler v. Druggists Medical Ins. Co., 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Therefore, it is unnecessary to inquire whether the statute is intended to benefit or burden women, because the same standard of review applies. *Wengler, supra.* The reasoning underlying this approach is that any gender-based classification stigmatizes women, even one which is apparently directed against men only. Gender-based classifications can constitute legally sanctioned second class citizenship and must pass constitutional review even if the classification was originally envisioned as a benefit to one gender.[2]

---

[2] Laws which establish gender-based classifications are often characterized as protective and beneficial. The same types of laws applied to racial groups would be readily recognized as invidious.

## I. *The Federal Constitutional Question*

In the last decade, gender-based legislative classifications have become the subject of an ever-increasing number of legal challenges.[3] The United States Supreme Court has struggled with such challenges in a long line of cases which reached a culmination of sorts with the decision in *Orr v. Orr*, 440 U.S. 268, 59 L.Ed.2d 306, 99 S.Ct. 1102 (1979). *Orr* presented the question of the constitutionality of Alabama's alimony statutes which provided that husbands, but not wives, may be required to pay alimony upon divorce. It had been established by the Court's prior holdings on the subject of gender-based legislative classifications that the Alabama statutes created a classification subject to scrutiny under the Equal Protection Clause,[4] and that the classification was not shielded from scrutiny because it facially discriminated against men rather than women.[5] To test the statute's constitutionality the Court applied the test first enunciated in *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50

"The pedestal upon which women have been placed has all too often, upon closer legal inspection, been revealed as a cage." *Sail'er Inn, Inc. v. Kirby*, 5 Cal.3d 1, 20, 485 P.2d 529, 541, 95 Cal. Rep. 329, 341 (1971).

[3] *See generally Wengler v. Druggists Medical Ins. Co.*, 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980); *Parham v. Hughes*, 441 U.S. 347, 99 S.Ct. 1742, 59 L.Ed.2d 269 (1979); *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 54 (1979); *Califano v. Westcott*, 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979); *Califano v. Boles*, 443 U.S. 282, 99 S.Ct. 2767, 61 L.Ed.2d 44 (1979); *Personnel Administration of Massachusetts v. Feeny*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979); *Califano v. Goldfarb*, 430 U.S. 119, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Stanton v. Stanton*, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S. Ct. 1225, 43 L.Ed.2d 514 (1975); *Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Kahn v. Shevin*, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1975); *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). *See also* "Gender-Based Alimony Statutes" 1979 Ann Survey Am.L. 524 (1979).

[4] *Reed v. Reed, supra* Note 3.

[5] *Craig v. Boren, supra.*

L.Ed.2d 397 (1976). To withstand scrutiny under the Equal Protection Clause "classifications by gender must serve important governmental objectives and must be substantially related to achievement of these objectives."[6] 429 U.S. at 197, 97 S.Ct. at 457, 50 L.Ed.2d at 407. The Court considered several governmental objectives that might be offered to uphold the validity of the gender-based classification. They concluded the statute could not be sustained if its purpose was to legislatively reinforce a family model in which the wife plays a dependent role.[7] The Court also concluded that while the purpose of providing help for dependent spouses by using gender as a proxy for need was an important and legitimate governmental purpose, there was no valid reason to use gender as a proxy for need because the Alabama statutory scheme provided for individualized hearings at which the parties' relative financial circumstances are considered.[8] Accordingly, men could be helped as well as women with little if any additional burden on the state. Therefore, the Court concluded that while this purpose was legitimate and important, the classification by gender was not substantially related to its achievement.

The Court also considered whether the statute could be sustained if its purpose was viewed as attempting to compensate women for a long history of discrimination and economic disadvantage. Conceding this was a legiti-

---

[6] This test has been called by some the "middle tier"test. It is also referred to as the important governmental interest test; a test more stringent than the rational relationship test and less stringest than the compelling interest test. *Orr* firmly established this test and in this regard represents the failure of the plurality in *Frontiero v. Richardson*, supra Note 3, to persuade their brethren that classifications by gender are suspect. *See Craig v. Boren*, supra Note 3, (Powell, J., concurring).

[7] "No longer is the female destined solely for the home and the rearing of family, and only the male for the marketplace and the world of ideas." *Stanton v. Stanton*, 421 U.S. 7, 14, 95 S.Ct. 1373, 1378, 43 L.Ed.2d 688, 695 (1975).

[8] The West Virginia Separate Maintenance Statute is identifiable in this respect in that it directs the court to ". . . consider[ing] the circumstances of the parties . . . ."

mate purpose,[9] the Court concluded the statute actually produced perverse results by giving advantage only to the financially secure wife by relieving her of the burden of paying alimony to a dependent husband. Thus, wives benefiting from the statutory scheme were those who were not dependent on their husbands and, therefore, were the least likely to have been victims of past discrimination. Once again, the Court concluded that while the purpose was legitimate and important, the classification by gender was not substantially related to its achievement. "Where, as here, the State's compensatory and ameliorative purposes are as well served by a gender-neutral classification as one that gender classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex." *Orr v. Orr*, 440 U.S. 268, 283; 99 S.Ct. 1102, 1113, 59 L.Ed.2d 306, 321. Upon this analysis the Court held: "[t]he Alabama statutory scheme of imposing alimony obligations on husbands but not wives violates the Equal Protection Clause of the Fourteenth Amendment."

We conclude this holding controls the disposition of petitioner's federal claim. The West Virginia Separate Maintenance Statute accords the right to seek separate maintenance only to the wife, and in this regard suffers from the same fatal defect as the Alabama alimony statutes, and as did the Alabama statutes, it fails the middle-tier or important governmental objective test. We hold *W.Va. Code* 48-2-28 (1976) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by reason of the fact that it establishes a gender-based classification permitting wives but not husbands to seek separate maintenance.

## II. *The State Constitutional Question.*

Petitioner contends *W.Va. Code* 48-2-28 (1976) violates his right to equal protection as guaranteed by Article

---

[9] *Califano v. Webster*, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977).

III, Section 17 of the West Virginia Constitution.[10] In its earliest cases on the subject this Court discussed the constitutional guarantee of equal protection found in Article III, Section 17,[11] but did not enunciate the tests to be applied in various circumstances. Then, in the case of *Cimino v. The Board of Education of Marion County,* 158 W.Va. 267, 210 S.E.2d 485 (1974), the Court considered the then two-tiered federal approach,[12] and applied the rational relationship test. The two-tiered federal approach was expressly adopted by this Court in *State ex rel. Piccirillo v. The City of Follansbee,* 160 W.Va. 329, 233 S.E.2d 419 (1977). Because we have not addressed the subject subsequent to the expansion of the federal approach to three tiers, we now consider whether, in assessing petitioner's West Virginia constitutional challenge, we will adopt and apply the important governmental test followed in *Orr,* or strike our own course.[13] Our inquiry will benefit by a brief review of the inauspicious emergence and guarded evolution of the middle-tier approach.

*Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) marked one of the earliest attempts to come to

---

[10] The courts of this State shall be open, and every person, for an inury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay.

[11] *State ex rel. Payne v. Walden,* 156 W.Va. 60, 190 S.E.2d 770 (1972); *Linger v. Jennings,* 143 W.Va. 57, 99 S.E.2d 740 (1957).

[12] Those two tests are the rational relationship test under which a legislative classification must be sustained unless it is patently arbitrary and bears no rational relationship to a legitimate governmental interest, *see Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); and the compelling interest test which holds classifications based upon race, alienage, national origin or poverty are inherently suspect, must be subjected to strict judicial scrutiny and invalidated unless the state demonstrates a compelling interest to justify them. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

[13] States have the power to interpret state constitutional guarantees in a manner different than the United States Supreme Court has interpreted comparable federal constitutional guarantees. *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975).

grips with gender-based classifications. *Reed* is cited for the proposition that classifications by gender are subject to scrutiny under the Equal Protection Clause.

In *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), a majority concurred in a judgment that a United States Code provision containing a gender-based classification was a denial of due process under the Fifth Amendment to the United States Constitution.[14] A plurality of the Court composed of Justices Brennan, White, Marshall, and Douglass concluded gender was an inherently suspect classification, and would have applied the compelling interest test.

In *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), the Court invalidated certain gender-based classifications contained in the Social Security Act as being violative of the Fifth Amendment. While citing *Frontiero* and *Reed*, the Court, without expressly saying so, applied the rational relationship test but ignored the question of whether classifications by gender were inherently suspect.

Then, in the case of *Craig v. Boren, supra,*[15] the Court for the first time enunciated the middle-tier approach. "To withstand constitutional challenge, . . . classifications by gender must serve important governmental objectives and must be substantially related to the achievement of those objectives." 429 U.S. 190, 196, 97 S.Ct. 451, 456, 50 L.Ed.2d 397, 407 (1976). The Court ap-

---

[14] "While the Fifth Amendment contains no Equal Protection Clause, it does forbid discrimination by the federal government that is 'so unjustifiable as to be violative of due process.'" *Schneider v.Rusk*, 377 U.S. 163, 168, 84 S.Ct. 1187, ___, 12 L.Ed.2d 218, 222 (1964).

[15] The birth of the middle-tier approach was accomplished quietly. The Court merely said: "To withstand constitutional challenge, *previous cases* establish that classifications by gender must . . . ." (Emphasis supplied) It is less than clear what previous cases establish the rule as articulated. One might infer that if previous cases did in fact, establish the rule in this form they would have been cited. Notwithstanding its questionable parentage, the middle-tier approach has with *Orr* become respectable.

plied this new test in *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977), and with the *Orr* decision fully legitimized it.

We are unimpressed with the lineage of the middle-tier approach which we believe, as Justice Powell so candidly pointed out,[16] is largely the product of "result oriented" decision-making. We find more merit in the position of the plurality in *Frontiero, supra,* that classifications by gender are suspect. Prior to *Craig v. Boren, supra,* Federal District Courts also found this reasoning to be persuasive,[17] and state courts in Massachusetts, New York and Nevada have held that classifications by gender are suspect and are to be accorded strict scrutiny.[18] A brief analysis of the development of the concept of suspect classifications reveals why gender-based classifications are properly placed among them.[19]

The first mention of the concept that eventually evolved into the compelling interest test for suspect classifications appears in *United States v. Carolene Products Company,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). In footnote 4 of that opinion the Court indicated certain types of legislative classifications affecting minorities might be subject to "more searching judicial inquiry."

The notion that these certain types of classifications might be considered suspect was first enunciated in 1944. "It should be noted, to begin with, that all legal

---

[16] *Craig v. Boren, supra* Note 3, Ftn.\*.

[17] *See, e.g., United States v. Reiser,* D.C., 394 F.Supp. 1060 (1975); *Johnston v. Hodges,* 372 F.Supp. 1015 (1974); *Daugherty v. Daley,* D.C., 370 F.Supp. 338 (1975).

[18] *Marsha D. v. Donald D.,* 85 Misc.2d 637, 380 N.Y.S.2d 904 (1976); *Thaler v. Thaler,* 89 Misc.2d 315, 391 N.Y.S.2d 331 (1977); *In Re P.,* 92 Misc.2d 62, 400 N.Y.S.2d 455 (1977); *Opinion of the Justices of the House of Representatives,* ___ Mass. ___, 371 N.E.2d 426 (1977); *Commonwealth v. King,* 374 Mass. 5, 372 N.E.2d 196 (1977); *Oueilhe v. Lovell,* 93 Nev. 111, 560 P.2d 1348 (1977).

[19] We were led to much of the material regarding suspect classifications by "The Characteristics of Suspect Classification" (1980) (An unpublished article by Jamie Campbell of Dalhousie Law School, Halifax, Nova Scotia).

restrictions which curtail the civil rights of a single racial group are immediately suspect. ... [This] is to say the Court must subject them to the most rigid scrutiny." *Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 194; 89 L.Ed. 194, 199 (1944).

Because the Court's decision-making in this area has been result-oriented, the Court has of necessity avoided a forthright and specific expression of those factors which mark a suspect class. We can, however, look at the results of these cases which have held classifications based upon race,[20] alienage,[21] national origin,[22] and poverty[23] to be inherently suspect, and from these results we can extrapolate certain criteria indicative of the suspect classification.

Classifications based upon a characteristic that is permanent, immutable, or a condition of birth have been held to be suspect. *Korematsu, supra.* Likewise, a history of past discrimination and political powerlessness is significant of suspectness. *San Antonio School District v. Rodriguez, supra.* Although it has been inferred that the large size and imprecise nature of a classification may be factors negating suspect status,[24] size alone will not preclude suspectness.[25]

It is readily apparent that gender, like other classifications previously designated as suspect, possesses certain of these indicia of suspectness. Gender is biologically permanent. It is an obvious and easily recognizable characteristic which, like race, can carry with it a stig-

---

[20] *See Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *McLaughlin v. Florida*, 379 U.S. 184, 13 L.Ed.2d 222, 85 S.Ct. 283 (1964).

[21] *Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

[22] *See Oyama v. California*, 332 U.S. 633, 644-46, 68 S.Ct. 269, 92 L.Ed. 249 (1948); *Korematsu v. United States*, 323 U.S. 214 at 216, 65 S.Ct. 193 at 194, 89 L.Ed. 194 (1944).

[23] *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

[24] *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (classification based on "old age").

[25] *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (classification based on economic status).

ma of inferiority. *Sail'er Inn, Inc. v. Kirby*, 5 Cal.3d 1, 485 P.2d 529, 95 Cal. Rptr. 329 (1971). Since gender, like race and national origin is, practically speaking, immutable, the imposition of special disabilities upon members of a particular gender violates "the basic concept of our system that legal burdens should bear some relationship to individual responsibility." *Weber v. Aetna Casualty and Surety Company*, 406 U.S. 164, 175, 92 S.Ct. 1400, 1407, 31 L.Ed.2d 768, 779 (1972). Classifications based on factors that bear no relationship to ability to perform, such as classifications based upon gender, have the effect of relegating the entire class to inferior legal status without regard to individual capabilities.

Among the various indicia of suspectness the one deserving of the most emphasis is a history of past discrimination. Classifications by gender fit this historical pattern well and women have been the victims. Women have long labored under a comprehensive legal and social system where it is difficult to separate the written and unwritten rules. Virtually the whole weight of male-dominated, male-written history seems to buttress a system that, until not so long ago, denied women the right to vote, to serve on juries, to secure credit, to own and deal with property, to sue and be sued, to make contracts, and even to refuse sex in marriage. One cannot begin to assess the crushing and nocuous effects of this system upon the personal, social and economic potential of countless women. It has created a debt that can never be repaid, only forgiven. The system's all-encompassing nature is evidenced by the very fact that until relatively recently not even women themselves in any significant numbers questioned the "rightness" of the scheme which assigned to all women this benignly protective but unquestionably inferior status. These sexist attitutes made sacrosanct by the legal structure have been so firmly planted in our national belief that no institution has been free from their taint.[26] This long-standing

---

[26] Man is or should be woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of

and comprehensive system of discriminatory laws directed toward women should compel the strictest possible judicial scrutiny of its remaining vestiges.

The conclusion that classifications by gender are suspect is also influenced by the public policy of this State as manifested by recent legislative actions.[27] These actions by a co-equal branch of government indicate that without doubt it is the public policy of this State to foster equal opportunity without regard to gender, to eliminate gender-based classifications wherever possible, and to regard such classifications with disfavor. These statements of policy lead us to conclude that in West Virginia any gender-based classification is to be regarded as suspect.

Based upon the foregoing considerations we hold that when gender-based legislative classifications are chal-

---

civil life. The paramount destiny and mission of women are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator. *Bradwell v. State*, 83 U.S. 130, 21 L.Ed. 442 (1873), (Bradley, J., concurring).

[27] The Revised Uniform Reciprocal Enforcement of Support Act, *W.Va. Code* 48-8-1 to 42 (1976); 48-9-15 (Cum. Supp. 1980); and the Article on Sexual Offenses, *W.Va. Code* 61-8B-1 to 13 (1977) both use gender-neutral language. The West Virginia Human Rights Act, *W.Va. Code* 5-11-1 to 19 (1979) which prohibits discrimination on the basis of sex declares that "[i]t is the public policy of the State of West Virginia to provide all of its citizens equal opportunity ... The denial of these rights to properly qualified persons by reason of ... sex, ... is contrary to the principles of freedom and equality of opportunity and is destructive to a free and democratic society." *W.Va. Code* 48-2A-1 to 8 (Cum. Supp. 1980) "Prevention of Domestic Violence" is written in a gender-neutral fashion and does not rely upon classifications by gender. *W.Va. Code* 48-2-15 (Cum. Supp. 1980) does away with any legal presumption favoring the mother in matters of child custody. *W.Va. Code* 48-2-23 (Cum. Supp. 1980) removes former impediments to a wife resuming maiden name. West Virginia early on ratified the Equal Rights Amendment to the United States Constitution. Senate Joint Resolution No. 3, First Extraordinary Session, at 743 (1972). *W.Va. Code* 2-2-10 (a) (1979) provides in the construction of statutes, unless a different intent on the part of the Legislature is apparent from the context that a word importing a masculine gender only may be applied to females as well as males.

lenged as denying the right to equal protection guaranteed by Article III, Section 17 of the West Virginia Constitution they are to be regarded as suspect, accorded the strictest possible judicial scrutiny, and are to be sustained only if the State can demonstrate a compelling interest to justify the classification.

Applying the compelling interest test to *W.Va. Code* 48-2-28 (1976) leaves little doubt as to the outcome. As the first section of this opinion indicates, no important governmental interest was found to enable the statute to withstand the middle-tier federal test. Accordingly, there is no hope an interest can be advanced to allow the statute to withstand the compelling interest test.

As a practical matter the State is unrepresented in this proceeding and neither the respondent nor the respondent/intervenor advances a compelling State interest to justify this classification. And, while in this void we could speculate as to what State interest is promoted by this classification, such speculation would be vain. After a careful review of the myriad cases which have discussed gender-based classifications in domestic relations statutes, we perceive no compelling State interest in the denial of separate maintenance to all men. Indeed, every indication is that the State's interest is entirely compatible with separate maintenance awards to husbands.[28] In this regard, the classification embodied in the separate maintenance statute subverts present State policy.

The Statute fails to pass the intense scrutiny demanded under the test we have adopted today. No compelling State interest justifies its gender-based classification. Accordingly, we hold that by establishing a gender-based classification permitting wives but not husbands to seek separate maintenance, *W.Va. Code* 48-2-28 (1976) violates the guarantee of equal protection found in Article III, Section 17 of the West Virginia Constitution.

The question now becomes one of the remedies appropriate to the instant case. Petitioner's counsel would

[28] *See* Note 27, *supra.*

have us invalidate the statute in its entirety and prohibit any further proceedings pursuant to its authority. Counsel for respondent/intervenor urges as to extend the statute to cover men as well as women by applying it in a gender-neutral fashion.

> Where a statute is defective because of under-inclusion there exist two remedial alternatives: a court may either declare it a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion. *Welsh v. United States*, 398 U.S. 333, 361, 90 S.Ct. 1792, 1807-08, 26 L.Ed.2d 308, 331 (1970).

The approach of extending a statute's benefits by neutral application has been employed in several federal cases, [29] and at least two state courts have followed it in decisions dealing with statutes substantially identical to *W.Va. Code* 48-2-28 (1976).[30]

Choosing between invalidation or neutral extension requires an ascertainment of the predominate legislative purpose underlying the statute's enactment. *Beal v. Beal*, 388 A.2d 72 (Me. 1978). That is to say, given the nature and substance of the statute, its legislative history, if any, considering it in the context of the larger domestic relations scheme of which it is a part, and considering the relevant economical, social, and historical implications, can it be validly concluded that benefits should be terminated to the class of persons who now benefit by the statute, *i.e.*, women? We believe not. Clearly the legislative purpose embodied in the separate maintenance statute is to provide financial help to the dependent spouse and thereby preserve the economic status of the marriage pending further developments. This purpose would be thwarted by an invalidation of

---

[29] *E.g., Califano v. Goldfarb, supra* Note 3; *Weinberger v. Wiesenfeld, supra* Note 3; *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

[30] *See, e.g., Orr v. Orr*, 374 So.2d 895 (Ala. App. 1979); *Beal v. Beal*, 338 A.2d 72 (Me. 1978).

the statute, but by extending the statute's benefits to men we conclude the legislative purpose would be effectuated. This approach avoids interference with the numerous cases already decided in lower courts upon the authority of this statute, does not render such judgments voidable and permits the uninterrupted use of this important domestic relations tool until such time as the Legislature can take appropriate remedial action.

Accordingly, we hold that *W.Va. Code* 48-2-28 (1976) is to be applied in a gender-neutral fashion thereby extending the right to seek separate maintenance to both men and women. Awards are to be based solely upon the relative need of the parties.

Accordingly, we deny the Writ of Prohibition.

*Writarrt denied.*